IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE AT CHATTANOOGA

------------------------------------------------------

SHARON GUTHRIE,                    :
                                   :
                                   :
          Plaintiff,               :
                                   :
-vs-                               : NO. 1:22-cv-00162
                                   :
THE UNITED STATES OF AMERICA,      : Jury Demanded
                                   :
                                   :
          Defendant.               :
------------------------------------------------------

THE DEPOSITION OF

SHARON GUTHRIE

November 29, 2023

------------------------------------------------------

Whitney A. Vaughn, TN LCR# 418

Angel & Associates Court Reporting

P.O. Box 1145

Hixson, Tennessee 37343

(423) 876-4435 and 800-298-DEPO (3376)

1                    INDEX OF EXAMINATION
                                              Page
2
    Examination By Mr. Fair..................    5
3
    Examination By Mr. Kuhlman...............   142
4
5
6                    INDEX OF EXHIBITS

7    1    Plaintiff's Response to Defendant's .. 8
          Interrogatories to Plaintiff
8
     2    Plaintiff's Response to Defendant's .. 8
9         Request for Production of Documents
          to Plaintiff
10
     3    Social Security Administration .......32
11        Notice of Reconsideration
12   4    FICA Earnings........................39
13   5    Progress Note dated 11/2/20..........66
14   6    Progress Note dated 11/4/20..........68
15   7    Progress Note dated 11/5/20..........72
16   8    Google Map...........................86
17   9    Tennessee Electronic Traffic Crash ...90
          Report
18
     10   History and Physical dated 12/15/20..103
19
     11   Progress Noted dated 12/18/20........109
20
     12   Cleveland Imaging dated 12/23/20.....111
21
     13   Plaintiff's First Supplement to .....113
22        Plaintiff's Initial Disclosure Under
          Rule 26(a)(1)(A)
23
     14   Plaintiff's Rule 26 Expert ..........120
24        Disclosures
25   15   (Collective) Photographs A-W.........125

1    APPEARANCES:

2

3    Appearing for Plaintiff:

4

         CAMERON KUHLMAN, ESQUIRE
5        ckuhlman@wkfirm.com
         Wettermark Keith
6        1232 Premier Drive, Suite 325
         Chattanooga, Tennessee 37421
7        (423) 342-2600

8

9    Appearing for Defendant:

10

         J. SPENCER FAIR, ESQUIRE
11       spencer.fair@usdoj.gov
         Assistant United States Attorney
12       United States Department of Justice
         United States Attorney's Office
13       800 Market Street, Suite 211
         Knoxville, Tennessee 37902
14       (865) 225-1607

15

16

17   ALSO PRESENT:  Daniel Stanfield
     --------------------------------------------------------
18

19

20

21

22

23

24

25

1           The deposition of SHARON GUTHRIE,

2  called as a witness at the instance of the Defendant,

3  for purposes of discovery, pursuant to the Federal

4  Rules of Civil Procedure, taken pursuant to agreement

5  on November 29, 2023, at the law offices of

6  Wettermark Keith, 1232 Premier Drive, Suite 325,

7  Chattanooga, Tennessee 37421, commencing at

8  9:59 a.m., before Whitney A. Vaughn, Court Reporter

9  and Notary Public.

10

11

12           S T I P U L A T I O N

13           It being agreed between counsel for

14  the respective parties that Whitney A. Vaughn, Court

15  Reporter and Notary Public, may swear the witness,

16  take her deposition in machine shorthand, afterwards

17  reducing the same to typewriting.

18           All objections, except as to the form of

19  the question and responsiveness of the answer, are

20  reserved to on or before the hearing.

21           It being further agreed that all

22  formalities as to notice, caption, certificate,

23  transmission, etc., are expressly waived.  Signature

24  reserved.

25  //

(423) 876-4435           "Preserving The Record"         (800) 298-3376
Whitney Vaughn        Angel & Associates Court Reporting
Case 1:22-cv-00162-DCLC-SKL   Document 31-2   Filed 03/01/24   Page 4 of 151   PageID #: 314

1                    SHARON GUTHRIE,

2      called at the instance of the Defendant, having been

3      first duly sworn, was examined and testified as

4      follows:

5                      EXAMINATION

6      BY MR. FAIR:

7              Q      Good morning, Ms. Guthrie.

8              A      Good morning.

9              Q      My name is Spencer Fair.  I'm here on

10     behalf of the United States in this lawsuit that you

11     filed in federal court.  First I'm going to ask you

12     to state your full name for the record.

13             A      Sharon Maxine Guthrie.

14             Q      Have you ever given a deposition

15     before today?

16             A      No.

17             Q      I want to talk to you about just some

18     general ground rules to make things go more smoothly.

19     I'm going to ask you questions.  It's important that

20     you give verbal responses, so words rather than

21     uh-huh or huh-uh or nodding your head, which is a

22     very common thing for people to do.  And if I catch

23     you doing it, I'll try to remind you or your attorney

24     probably will too, because the court reporter is

25     taking everything down, and it's harder to capture a

1 head nod than a word.

2    A  Yes.

3    Q  And we'll try not to speak over each

4 other because that also makes it very hard for the

5 court reporter.  If I ask you a question that you

6 don't understand, feel free to let me know you just

7 don't understand what I'm asking you, and I'll try to

8 rephrase it in a way that makes sense.  And if at any

9 time you need to take a break, please let me know.

10 We'll take a break.

11    A  Thank you.

12    Q  Are you taking any medications today

13 which could affect your understanding of my questions

14 or your ability to answer them?

15    A  No.

16    Q  Okay.  What have you done to prepare

17 for the deposition today?

18    A  I spoke to my attorney.

19    Q  Have you reviewed any documents?

20    A  No.

21    Q  Okay.  I want to show you first a

22 document --

23      MR. KUHLMAN:  Can I interject for

24 just a second?  When he uses the phrase or the word

25 documents, he is -- I don't mean to put words in your

(423) 876-4435    "Preserving The Record"    (800) 298-3376
Whitney Vaughn    Angel & Associates Court Reporting
Case 1:22-cv-00162-DCLC-SKL   Document 31-2   Filed 03/01/24   Page 6 of 151   PageID #:
316

1    mouth, but I think he is referring to that term

2    broadly to include things like photographs, exhibits,

3    this sort of thing.  Or do you mean just what you --

4                    MR. FAIR:  Sure.  Yeah.

5    BY MR. FAIR:

6            Q       Have you reviewed anything?

7            A       I've looked at the pictures.

8            Q       And the pictures, would those be the

9    photographs that you produced to me in discovery most

10   likely?

11           A       Yes.

12           Q       Okay.  We'll look at those later.  I

13   want to show you this document here.  I've got a copy

14   for your attorney.  And this document is titled

15   Plaintiff's Response to Defendant's Interrogatories.

16   Do you see that on the front page?

17           A       Yes.

18           Q       And if you will flip to not the last

19   page but the second to last page, there is a

20   signature on there.  I think you're on it right there

21   where your hand is.  Does that appear to be your

22   signature?

23           A       Yes.

24           Q       Do you recall signing this document

25   and then assisting with the responses in this

1    **document?**

2         A    Yes.

3            MR. FAIR:  Okay.  We'll come back to

4    that as well, but I want to make that Exhibit 1 to

5    your deposition.

6            (Whereupon, the document, as referred

7    to above, was marked and subsequently attached hereto

8    as Exhibit No. 1.)

9    BY MR. FAIR:

10         **Q**    **This next document is titled**

11   **Plaintiff's Response to Defendant's Request For**

12   **Production, and it looks a lot like the other**

13   **document.  Do you remember assisting with responding**

14   **to these requests for production?  And this isn't one**

15   **you would have signed.**

16         A    I started to say.

17            MR. KUHLMAN:  His question was, do

18    you remember assisting with this, not is this a

19    document that you signed.

20            THE WITNESS:  Yes.

21            MR. FAIR:  If you recall.  Okay.

22    We'll make that Exhibit 2.

23            (Whereupon, the document, as referred

24    to above, was marked and subsequently attached hereto

25    as Exhibit No. 2.)

(423) 876-4435       "Preserving The Record"      (800) 298-3376
Whitney Vaughn      Angel & Associates Court Reporting
Case 1:22-cv-00162-DCLC-SKL   Document 31-2   Filed 03/01/24   Page 8 of 151   PageID #: 318

1    BY MR. FAIR:

2            Q       What is your date of birth?

3            A       July 22nd, 1967.

4            Q       And that makes you how old today?

5            A       Fifty-six.

6            Q       And on the date of the accident in

7    2020, would you have been 53?

8            A       Yes.

9            Q       All right.  What is your current

10   address?

11           A       1761 Highway 30 East, Athens,

12   Tennessee 37303.

13           Q       And is that the same address that you

14   lived -- where you lived in December 2020?

15           A       Yes.

16           Q       And is this fairly close to the scene

17   of the collision?

18           A       Yes.

19           Q       All right.  Who lives in that home

20   with you?

21           A       Myself and my husband.

22           Q       And was that the case in December 2020

23   as well, just you --

24           A       Yes.

25           Q       -- and your husband lived there?  Do

1   you own that home?

2           A    Yes.

3           Q    How long have you lived there?

4           A    Six years and eleven months.

5           Q    Six years and eleven months.  So

6   nearly seven years.  Where did you live prior to

7   that?

8           A    1360 Bucks Pocket Road, Old Fort,

9   Tennessee.

10          Q    And where is Old Fort, Tennessee?

11          A    It's in Bradley County.  It's 20 --

12  28 miles probably from our house.

13          Q    Okay.  And you're married?

14          A    Yes.

15          Q    Were you married in December 2020 as

16  well?

17          A    Yes.

18          Q    Okay.  What's your husband's name?

19          A    Daniel Stanfield.

20          Q    And how long have you been married to

21  Mr. Stanfield?

22          A    Five years.

23          Q    And prior to Mr. Stanfield, have you

24  been married?

25          A    Yes.

```
1         Q      How many times?
2         A      Twice.
3         Q      What are the names of your other
4    previous husbands?
5         A      Roger Guthrie.
6         Q      And what were the years with
7    Mr. Guthrie?
8         A      1982 to 1997.
9         Q      And then the other husband?
10        A      Robert Shultz.
11        Q      And what were the years there?
12        A      2001 to 2012.
13        Q      Do you have any children?
14        A      Yes.
15        Q      Are they adults?
16        A      Yes.
17        Q      Where do -- how many children do you
18   have?
19        A      One.
20        Q      What's his or her name?
21        A      Kevin Guthrie.
22        Q      How old is Kevin?
23        A      Thirty -- he is forty.  He just had a
24   birthday.
25        Q      Happy birthday, Kevin.  Do you have
```

1    any criminal background?

2          A    No, sir.

3          Q    **Never been charged with a crime or --**

4          A    No.

5          Q    **-- convicted of a crime?  Have you**

6    **ever been involved in a civil lawsuit, other than**

7    **this one, as a plaintiff or a defendant?**

8          A    Yes.

9          Q    **Okay.  Tell me about that.**

10         A    I have sued several tenants.

11         Q    **Okay.**

12         A    I've never actually been sued, but I

13   have sued.

14         Q    **And the concept of suing tenants, I'm**

15   **assuming you own some property where other**

16   **individuals rent from you?**

17         A    Yes.

18         Q    **How many pieces of property do you own**

19   **that are rented?**

20         A    Five.

21         Q    **Are all those located in Bradley**

22   **County?**

23         A    No.

24         Q    **Where are they located?**

25         A    One is in Bradley County, two are in

1    Polk County, and McMinn County.  The rest are in

2    McMinn County.

3         **Q    How long have you owned these**

4    **properties?  I assume probably not all at the same**

5    **time.**

6         A    The oldest one is from 2006, and the

7    newest one is from a year and four or five months.

8         **Q    Are these all residential properties?**

9         A    Yes.

10        **Q    And the purpose of the lawsuits you**

11   **have been involved in were suing tenants I assume for**

12   **rent?**

13        A    Yes.

14        **Q    Okay.  Any other civil litigation that**

15   **you have been involved in other than suing tenants?**

16        A    No.

17        **Q    Where did you grow up?**

18        A    Benton, Tennessee.

19        **Q    What county is that in?**

20        A    Polk.

21        **Q    Home of the bacon, right, the Benton's**

22   **Bacon?**

23        A    No.

24        **Q    No?  That's not in Polk County?**

25        A    No.

1      Q      Okay.  I don't know where it is then.
2  Do you?

3      A      Madisonville.

4      Q      That's in Madisonville.  Okay.  Where
5  did you go to high school?

6      A      I went to Polk County High School,
7  and -- but I graduated from Bradley Central High
8  School.

9      Q      What year did you graduate from
10 Bradley Central?

11     A      1985.

12     Q      Beyond high school, do you have any
13 further formal education?

14     A      I -- yes.

15     Q      Tell me about that.

16     A      I have some college.  I do not have a
17 degree, but I do have some college.  And I also have
18 some classes in landscape and landscape design.

19     Q      Where did you receive some college?

20     A      Cleveland State and Chattanooga State.

21     Q      Where did you attend the classes on
22 landscape and landscape design?

23     A      Chattanooga State.

24     Q      When you attended some college in
25 Cleveland -- at Cleveland State, was that soon after

1   graduating high school?

2        A     Yes.

3        Q     Okay.  And then when did you take

4   these landscape and landscape design classes

5   generally?

6        A     I would -- I think 1999 and 2000.

7        Q     And what was the purpose of taking

8   those classes?

9        A     I owned a lawn care business.

10       Q     Okay.  What was the name of that lawn

11   care business?

12       A     Lawn Care and More.

13       Q     When did you first open up that lawn

14   care business?

15       A     1999, I think.

16       Q     Is it still functioning?

17       A     No.

18       Q     When did it stop functioning?

19       A     2018.

20       Q     And why -- why did you stop running

21   that business in 2018?

22       A     Age.

23       Q     What did you do with Lawn Care and

24   More?  What were your duties/roles?

25       A     The landscaping, scheduling, mowing

(423) 876-4435      "Preserving The Record"      (800) 298-3376
Whitney Vaughn      Angel & Associates Court Reporting
Case 1:22-cv-00162-DCLC-SKL   Document 31-2   Filed 03/01/24   Page 15 of 151   PageID #: 325

1   grass, payroll.

2          Q      Everything?

3          A      Yeah.

4          Q      Did you have W-2 employees at that

5   business?

6          A      No.  1099.

7          Q      Are you employed now?

8          A      No.

9          Q      When was the last time you worked?

10         A      September 30th of 2020.

11         Q      And you have a very specific date

12  there.  Was there something significant that happened

13  on September 30th, 2020?

14         A      Yes.

15         Q      What happened?

16         A      I got sick.

17         Q      Okay.  How did you get sick?

18         A      I took a shingles shot and got really,

19  really bad sick.

20         Q      And when you said really bad sick, how

21  long did the sickness impact you?

22         A      I think two months.

23         Q      And then before this shot, what were

24  you doing for employment?

25         A      Running a food trailer and a pawn

1    shop.

2           Q     Okay.  So I did see that reference in

3    your interrogatories, a food trailer.  Is a food

4    trailer like a food truck or is this a trailer that

5    hauls food from place to place?  What is a food

6    trailer?

7           A     The one we had, it was a 24-foot

8    kitchen on wheels.

9           Q     Okay.  And would you drive it to

10   certain parking lots and open it up for people to

11   purchase food from you?  Is that how it worked?

12          A     Yes.

13          Q     And what type of food would you make

14   in that trailer?

15          A     Hamburgers, hot dogs, chicken strips,

16   chili, barbecue.  I had a special every day.

17          Q     How long did you run that business

18   with the food truck?

19          A     Just a little over a year, like a year

20   and maybe two months.

21          Q     Did it have a name?

22          A     Yes.  D&S Kitchens.

23          Q     D&S Kitchens.  What was D&S?

24          A     Danny and Sharon.

25          Q     And does the Danny reference your

1  husband?

2         A     Yes.

3         Q     So your husband was involved in that

4  business as well?

5         A     Yes.

6         Q     Were you co-owners in that business?

7         A     Yes.

8         Q     Where did you normally park it to

9  serve people?

10        A     The last few months was at Waupaca,

11 mostly.

12        Q     And what is Waupaca?

13        A     It's a foundry.  They made brake

14 parts.

15        Q     So it was a factory where the

16 employees of that factory would come buy food from

17 you for lunch or -- is that how that normally worked?

18        A     Yes.

19        Q     Yeah.  And what was the reason for --

20 well, when did you close the food trailer?  Was that

21 the September 30, 2020, date?

22        A     I wouldn't say we closed it until we

23 sold it.

24        Q     Okay.  When did you sell it?

25        A     May of 2021.

1          Q     Okay.  I want to direct you to

2    Exhibit 1.  And on page 6 of that document towards

3    the bottom, there is a question asked that's number

4    10.  Do you see that?

5          A     Yes.

6          Q     And the question was about your

7    employment during the ten years preceding the motor

8    vehicle accident.  And your answer to it is on the

9    next page, page 7.  And in that response you said,

10   the third sentence, I closed the food trailer due to

11   illness in September 2020.  Is that accurate?

12         A     No.

13         Q     Okay.  Did you operate the food truck

14   after September 2020?

15         A     No.

16         Q     So your testimony is it wasn't

17   actually closed until it was sold, you told me

18   earlier, right?

19         A     Yes.

20         Q     But you didn't operate it or make any

21   money off of it as a food truck after September 2020,

22   right?

23         A     That is correct.

24         Q     Okay.  And there in that response, the

25   illness you're referring to, is that the sickness

1    from the shingles shot that you mentioned earlier?

2          A     Yes.

3          Q     But you stopped operating the food

4    truck before the December 15th, 2020, collision,

5    right?

6          A     I don't think I understand the

7    question.

8          Q     Okay.  Did you ever operate the food

9    truck between September 2020 and December 15th, 2020?

10         A     No.

11         Q     And prior to closing the food truck --

12   well, prior to no longer operating the food truck in

13   September 2020, what -- what was the monthly income

14   on average that you would receive from the food

15   truck?

16         A     I don't -- I don't know exactly.

17         Q     Can you give any sort of estimate?

18   I'm sure it varied.

19         A     Yes.  I would say 5,000, and that is

20   not an exact number.

21         Q     Okay.  And 5,000, would that be the

22   net what you received after cost or would that just

23   be the money made with cost coming out of that?

24         A     I think that's going to be gross, I

25   think.

1      Q      And then in terms of the expenses, can
2  you give a general percentage of how much of that
3  5,000 would go towards costs?
4      A      Twenty-five percent approximately.
5      Q      Okay.  You also mentioned in your
6  response number 10 and I think to me earlier that you
7  ran a pawn shop as well, right?
8      A      Yes.
9      Q      What was the name of the pawn shop
10 that you ran?
11     A      Etowah Pawn Shop.
12     Q      Were you the owner of the pawn shop?
13     A      Yes.
14     Q      Were you the sole owner?
15     A      Yes.
16     Q      Where was it located?
17     A      It's in Etowah.
18     Q      What was the address?
19     A      1102 Tennessee Avenue.
20     Q      And how long did you run that
21 business?
22     A      Thirteen years.
23     Q      How did you get into that business?
24 Like, what inspired you to own a pawn shop?
25     A      I just -- I just liked doing that kind

of thing. I liked visiting them and buying stuff from them, so...

**Q Had you ever worked in a pawn shop before owning one?**

A No.

**Q The premises where the pawn shop existed, did you own that property or did you have to rent the property?**

A At first, I rented it, and then I purchased it.

**Q Around when did you purchase it?**

A December of 2015.

**Q And I'm going to direct you back to Exhibit 1, that same response to number 10 that's on page 7. You said, I also ran a pawn shop. I closed the pawn shop due to COVID lockdown. Is that accurate?**

A Yes.

**Q When did that take place?**

A I do not know what month that happened.

**Q Okay. Would it have been before the December 15th, 2020, collision?**

A Yes.

**Q And when you closed the pawn shop down**

1    sometime prior to December 2020, what happens with

2    the inventory?

3            A     It stayed there.

4            Q     Okay.  Did someone else just purchase

5    the business from you and start running it?

6            A     No.

7            Q     Tell me how that works, then.

8            A     I sold all the contents in June of

9    this past year.  I still own the building.

10           Q     You still own the building now?

11           A     Yes.

12           Q     Does someone else rent the building

13   for running a different business?

14           A     No.

15           Q     Are you receiving any income from that

16   owned building currently?

17           A     No.

18           Q     So now the address, that building, is

19   essentially unused?

20           A     Correct.

21           Q     Okay.  And you don't have to tell me

22   for 13 years, but if we look at the last couple of

23   years that you owned that pawn shop and that it was

24   still running, say 2019, 2020, could you estimate

25   what your monthly income was from that?

1              A      No, not exactly, because it varies.

2              Q      **Okay.  What would have been a good**

3      **month during that time frame?**

4              A      Six thousand.

5              Q      **Okay.  And what would have been a bad**

6      **month?  Hopefully not zero.**

7              A      Four thousand.

8              Q      **Okay.  And is that -- again, is that**

9      **the gross or the net?**

10             A      Net.

11             Q      **Do you have a federal firearms license**

12     **as well?**

13             A      Not now.

14             Q      **You did at the time?**

15             A      I did.

16             Q      **When did you first obtain that?**

17             A      January of 2010.

18             Q      **And were you the sole person on that**

19     **license?**

20             A      Yes.  That might not be exact.

21             Q      **Yeah.  An estimate.  That's your**

22     **recollection?**

23             A      (Nods head.)

24             Q      **And when did you -- when did that no**

25     **longer become active?  Did you just not renew it?**

1      A      2023.  July of 2023.

2      **Q      And I'm assuming with that federal**

3 **firearms license your pawn shop involved firearm**

4 **sales?**

5      A      Yes.

6      **Q      Once -- once you no longer maintained**

7 **that federal firearms license as of July 2023, did**

8 **you still have firearm inventory?**

9      A      Not at that time.

10      **Q      How did you -- what did you do with**

11 **the firearm inventory prior to that time?**

12            MR. KUHLMAN:  Prior to the expiration

13 of the license?

14            MR. FAIR:  Yes.

15      A      I just sold it.

16 BY MR. FAIR:

17      **Q      Sold it?**

18      A      I sold everything that I didn't want

19 to keep.

20      **Q      And was that while the business was**

21 **still active or just afterwards when you were just**

22 **getting rid of the assets from the business?**

23      A      It was during the time of liquidating

24 the assets.

25      **Q      Did you ever receive a PPP loan --**

1          A      No.

2          Q      -- for any of your businesses?

3          A      No.

4                 MR. KUHLMAN:  I'll -- he is asking

5    questions.  You're giving answers.  Just remember to

6    let him finish his question before you give your

7    answer or she is going to start fussing at you.

8                 MR. FAIR:  She is very mean.

9                 MR. KUHLMAN:  This whole situation is

10   really out of hand if we could just take it down a

11   notch.

12                MR. FAIR:  For sure.

13   BY MR. FAIR:

14         Q      You also said in interrogatory

15   number 10 response that you might have been able to

16   reopen both of those businesses if not for your

17   injuries from the collision, right?

18         A      Correct.

19         Q      Which injuries from the collision

20   prevented you from reopening these businesses?

21         A      My shoulder, my knee, and my back.

22         Q      Okay.  And you said shoulder, knee,

23   and back.  Right, left, right?

24         A      Left shoulder, right knee, and the

25   left side of my back.

1        Q     **Your only back?**

2        A     Yeah.

3        Q     **Left side.  And how did those injuries**

4 **prevent you from reopening those businesses?**

5        A     Pain.  I'm unable to rack a 1911

6 pistol because of the pain in my shoulder.

7        Q     **What about the food truck business?**

8        A     I was unable to even get up in the

9 food trailer.  I couldn't gain entry to it.

10       Q     **Would that be more based on your knee**

11 **injury or all of it?**

12       A     I think it's all.

13       Q     **Okay.  And then I apologize.  The Lawn**

14 **Care and More business, you told me earlier that you**

15 **closed that down due to age in 2018.  So that -- that**

16 **decision wasn't related to your injuries from the**

17 **motor vehicle collision to close that down?**

18       A     No.

19       Q     **All right.  When were you -- at any of**

20 **these businesses, your pawn shop, food truck, Lawn**

21 **Care and More, were you ever employed as a W-2**

22 **employee?**

23       A     Yes.  Gerald -- Gerald Kersey used to

24 give me a W-2.

25       Q     **Who is Gerald Kersey?**

(423) 876-4435       "Preserving The Record"       (800) 298-3376
Whitney Vaughn      Angel & Associates Court Reporting
Case 1:22-cv-00162-DCLC-SKL   Document 31-2   Filed 03/01/24   Page 27 of 151   PageID #: 337

1          A     He owned a -- he owned several

2     businesses there in Cleveland.  And I do believe that

3     he could have been a -- an accountant or something.

4     I don't know that for a fact, but he owned several

5     businesses and I did all of the yards there.

6          **Q     Okay.  So that was related to the lawn**

7     **care business?**

8          A     Yes.

9          **Q     Do you know how you spell his last**

10    **name?**

11         A     K-E-R-S-E-Y.

12         **Q     So let's look at today.  What are your**

13    **sources of income today?**

14         A     Social security.

15         **Q     How much do you receive from social**

16    **security?**

17         A     Twelve-oh-nine.

18         **Q     And am I correct that part of that is**

19    **deducted for health insurance or is that what you**

20    **receive -- that's the money you receive?**

21         A     That's what I -- that's what I

22    receive.

23         **Q     That's per month?**

24         A     Yes.

25         **Q     What about your rental properties?**

1  **What type of income do you receive from those?**

2       A    I'll have to add it up.

3       **Q    Okay.**

4       A    I receive 1,300 from the house in

5  Bucks Pocket.

6       **Q    Per month?**

7       A    Yes.  675 from the house on 411; 525

8  from the apartment on 411; 1,200 from the one in

9  Englewood; and 800 from the tiny house.

10      **Q    It's a tiny house?**

11      A    Pardon me?

12      **Q    You said it's a tiny house?**

13      A    Yes.

14      **Q    So I'm going to break out the**

15 **calculator here.**

16           MR. KUHLMAN:  Thirty-four-fifty.

17           MR. FAIR:  Well, I was adding the

18 disability money into that.

19           MR. KUHLMAN:  Oh, okay.

20 BY MR. FAIR:

21      **Q    So the total I receive -- the 1,209**

22 **disability, plus the five rental property amounts you**

23 **told me, the calculation I got was $5,709 per month.**

24 **Does that sound about right to you?  I'm not asking**

25 **you to confirm math, but --**

1          A     I can't confirm that because I don't

2     know.

3                    DANIEL STANFIELD:  That's gross.

4     BY MR. FAIR:

5          **Q     Gross.  Yes.  I understand.  And then**

6     **medical insurance, what -- what kind of medical**

7     **insurance do you have?**

8          A     UMR, UnitedHealth.

9          **Q     And is that a government-sponsored --**

10    **is that through TennCare?**

11         A     No.

12         **Q     Okay.  How do -- how do you obtain**

13    **UMR?  Is that just purchased through the --**

14         A     It's through the Iron Workers.

15         **Q     Through the Iron Workers?**

16         A     (Nods head.)

17         **Q     How are you -- how do you receive that**

18    **through the Iron Workers?**

19         A     My husband is an iron worker.

20         **Q     So you're on his insurance?**

21         A     Yes.

22         **Q     Okay.  And is that the same insurance**

23    **you had in December 2020?**

24         A     Yes.

25         **Q     And you've told me that you do have --**

1  you have received approval for social security

2  disability, correct?

3          A    Yes.

4          Q    When did you receive that?

5          A    I think it was in June, but I was --

6  it was approved effective the date of the accident.

7          Q    The -- I understand what you're

8  saying.  You were given the approval of the

9  disability in June of 2023, but it backdated to the

10 date of the accident?  That's what you're saying,

11 right?

12         A    Yes.

13         Q    And what was the basis of your

14 disability?

15         A    Back injury, knee replacement,

16 shoulder, and a cyst in my brain.

17         Q    Anything else?

18         A    No.

19         Q    I want to show you -- we have your

20 Social Security Administration records, and this

21 document was contained within there.  And this was

22 one of the decisions from Social Security

23 Admission -- Administration as part of your process.

24 Do you see at the bottom of the first page of this

25 document, there is -- the last page before that says

1    you are unable to work because of -- and then it

2    lists numerous things.  Do you see that?

3             A    Yes.

4             Q    Could you read what things are listed

5    on this document after you said you are unable to

6    work because of?

7             A    Complications from COVID; torn

8    ligament in left shoulder; C7 vertebrae bulging;

9    14-15 bulging; torn meniscus, right knee; arthritis

10   in right knee; torn tendon in right foot; thyroid

11   storm; Hashimoto's; sleep apnea; COPD; brain fog;

12   anxiety; and heart problems.

13             MR. FAIR:  Okay.  Let's make that one

14   Exhibit 3.

15             (Whereupon, the document, as referred

16   to above, was marked and subsequently attached hereto

17   as Exhibit No. 3.)

18   BY MR. FAIR:

19             Q    And of those conditions you just read,

20   you agree that not all these conditions are related

21   to your motor vehicle accident, correct?

22             A    Yes.

23             Q    There was also -- well -- so on

24   December -- let's look at December 14th, 2020, which

25   is the day before the accident.

1          A      Yes.

2          Q      What were your sources of income then

3     on that day?

4          A      Just rental property.

5          Q      Just the rental property at that

6     point?  You had shut down the pawn shop, you had

7     stopped operating the food truck at that point,

8     correct?

9          A      Yes.

10         Q      In one of the requests for production,

11    which we don't have to look at, we had asked you to

12    produce your federal income tax returns for the

13    previous five years, and there was an objection.

14    But, first, I'll just ask, did you file your own

15    taxes during the past ten years?

16         A      Yes.

17         Q      You didn't have an accountant that

18    filed them for you?  You filed your own?

19         A      An accountant, yes.

20         Q      An accountant filed yours.  As a

21    business owner, did you keep those tax documents?

22         A      No.

23         Q      Okay.  Did the accountant keep those?

24    Do you know where those are?

25         A      I would think that the accountant has

1  them.

2       Q    Okay.  We -- in your social security

3  file, there was a document that had a summary of FICA

4  earnings for the years 2008 through 2023.  I just

5  want to go through those years and just discuss with

6  you what your recollection of your sources of income.

7  First let's look at 2008.  The earning -- the FICA

8  earnings for that year were zero.  Do you see that on

9  this page?

10      A    Yes.

11      Q    Can you explain why the FICA earnings

12  would have been zero in 2008?

13      A    No.

14      Q    Okay.  What were -- what were you

15  doing for work in 2008?

16      A    Lawn care business.

17      Q    And would the pawn shop have been

18  opened at that point, too?

19      A    No.

20      Q    What was the first year of the pawn

21  shop?

22      A    I think 2009.

23      Q    And then if we look at 2009 on this

24  document, the amount listed there is 8,102.  Do you

25  see that?

1          A      Yes.

2          Q      Would that have been from the lawn

3    care business and from the pawn shop?

4          A      Yes.

5          Q      Okay.  And does that -- does that

6    sound correct to you, that amount for 2009?

7          A      No.

8          Q      Okay.  What is your recollection of

9    what should have been in 2009 --

10         A      I don't know.

11         Q      -- your earnings?  Just not that?

12                MR. KUHLMAN:  Hold on a second.  Do

13   you need to take a break?

14                THE WITNESS:  I do, because I need to

15   ask you something.

16                MR. FAIR:  Well, we can take a break.

17   Yeah, just tell me.

18                (Whereupon, a short break was had.)

19                MR. KUHLMAN:  I think in response to

20   these questions about reported FICA earnings, I think

21   her answer -- she can answer.  But to the extent that

22   there is a difference between FICA-reported earnings

23   which are reported on a W-2 and the income reported

24   on her tax return, those are questions that are more

25   appropriately directed to an accountant for purposes

1    of determining whether or not she was properly

2    reported as a W-2 employee for certain businesses

3    versus whether or not she was generating business

4    income or other income that was not subject to FICA

5    withholdings.

6    BY MR. FAIR:

7         Q     Sure.  And really I'm -- I'm

8    wondering -- I'm asking these questions because I

9    wasn't provided tax returns as I requested.  So I'm

10   asking you to provide me estimates of what your

11   income was for those years.  And right now this is

12   all I have.  And I understand these are FICA

13   earnings, so there is probably more than what's here.

14   But I just want to ask you, if you can, to provide an

15   estimate of what your income was for these years.

16               So if we're looking back at the year

17   2009, the FICA earnings on this was 8,102.  What

18   would you estimate your total income was for that

19   year?

20        A     Honestly, I can't answer that.  I

21   don't know.

22        Q     Okay.

23        A     That's been a long time ago.

24        Q     Yeah.  And then, you know, if we just

25   look through these years generally, 2010, it's

1   also -- the FICA earnings are 8,631; 2011, 10,605;

2   2012, 9,430; 2013, 12,823; 2014, 9,669.  So did I say

3   all those correct so far?

4          A     Yes.

5          Q     Okay.  And your recollection, any W-2

6   earnings for those years would have related to your

7   lawn care business and the W-2s you received from

8   Mr. Kersey, right?

9          A     Yes.

10         Q     And then 2015, there is a difference

11  between these numbers leading up to this year, and

12  that is only listed 715.  Do you know why that might

13  be?

14         A     Yes.

15         Q     Okay.  Why would that be?

16         A     I would say that it is because I was

17  winding down the lawn care business --

18         Q     Okay.

19         A     -- at that point.

20         Q     Right.  And then 2016, it's down to

21  zero, the FICA earnings.  In 2017, 2,813; 2018,

22  4,908.  Those are -- I said all those accurately,

23  right?

24         A     Yes.

25         Q     And would that still be attributed to

1    the winding-down process, those amounts?

2          A     Yes.

3          Q     Okay.  And then 2019, the FICA is at

4    zero.  And in 2020 it's at 33,047, which is quite a

5    bit different from all these other years.  Do you

6    know why that would have been that amount in 2020?

7          A     Yes.

8          Q     Why is that?

9          A     Food trailer.

10         Q     So there was W-2 employment related to

11   the food truck to your recollection?

12         A     No.

13         Q     So you're unsure why this FICA

14   earnings would have been really on here?

15         A     I didn't understand the question.

16         Q     Okay.  Do you know why $33,047 in FICA

17   earnings would be listed for 2020?

18         A     Earnings.

19         Q     I understand.  But you said you were

20   not a W-2 employee of the food truck.  So do you have

21   any other explanation why there would be $33,000 in

22   FICA earnings for the year 2020?

23         A     No.

24               MR. FAIR:  Okay.  Let's make that one

25   Exhibit 4.

```
 1                    (Whereupon, the document, as referred

 2     to above, was marked and subsequently attached hereto

 3     as Exhibit No. 4.)

 4     BY MR. FAIR:

 5          Q     And then back to -- I had asked about

 6     health insurance earlier and you said you're on your

 7     husband's health insurance.  Do you pay premiums for

 8     that health insurance?

 9          A     No.

10          Q     Okay.  And then on the taxes that you

11     file, do you file jointly with your husband or do you

12     file individually?

13          A     Joint.

14          Q     And has that been the case throughout

15     the -- you said five years of marriage?

16          A     Yes.

17          Q     I want to talk to you about your

18     medical history before the December 15th, 2020,

19     collision.  And that covers a lot of things.  So

20     first let's talk about social behaviors.  Do you

21     smoke?

22          A     No.

23          Q     Have you ever been a smoker?

24          A     No.

25          Q     Drink alcohol on a regular basis?
```

```
 1          A     No.
 2          Q     Use drugs other than those prescribed
 3     by a health care provider?
 4          A     No.
 5          Q     Do you wear glasses?
 6          A     No.
 7          Q     Do you wear contacts?
 8          A     No.
 9          Q     Do you know what your vision is?
10          A     I think -- those are my reading
11     glasses.
12                MR. KUHLMAN:  He -- listen carefully
13     to his question because do you wear glasses.  You've
14     got glasses right here on the table.  The answer has
15     got to be yes.
16                THE WITNESS:  Yes.
17     BY MR. FAIR:
18          Q     Okay.  Do you -- you wear reading
19     glasses?
20          A     Yes.
21          Q     Do you wear any other corrective
22     lenses?
23          A     No.
24          Q     And do you know what your vision is?
25          A     No.
```

```
 1          Q      Have you ever been prescribed
 2    corrective lenses?
 3          A      Yes.
 4          Q      When were you last prescribed
 5    corrective lenses?
 6          A      1988.
 7          Q      And did you wear them for a period of
 8    time after that prescription?
 9          A      Yes.
10          Q      Did you stop at some point?
11          A      Yes.
12          Q      Why?
13          A      I had surgery on my eyes.
14          Q      Okay.  You've had surgery to correct
15    your vision?
16          A      Yes.
17          Q      But you're not sure what your vision
18    is now?
19          A      No.
20          Q      When was your surgery to correct your
21    vision?
22          A      1989.
23          Q      Okay.  And no surgery since then on
24    your eyes?
25          A      No.
```

Q    Mental health history.  There are some references to anxiety.  Is that accurate?

A    Yes.

Q    How long have you experienced anxiety?

A    Since December 15th of 2020.

Q    No history of anxiety before that?

A    No.

Q    How does this anxiety manifest itself for you?

A    Driving, loud noises.

Q    Is that it?  Any other times that it manifests itself?

A    No.

Q    Okay.  Are you currently receiving any treatment for this anxiety?

A    Just medicine.

Q    What medicine?

A    Citalopram.

Q    And what type of medicine is Citalopram?

A    I don't know.

Q    Okay.  Who prescribes it?

A    Cassandra Clendenen.

Q    I might need help with that name.  Cassandra with a C?

1        A    Yes.

2        Q    And what's that last name again?

3        A    Clendenen, C-L-E-N-D-E-N-O-N (sic).

4        Q    And is that a medical doctor or a

5 mid-level provider?

6        A    I think she is a nurse practitioner.

7        Q    Where is she employed?

8        A    Erlanger.

9        Q    Does she provide other treatment for

10 you beyond that medication?

11       A    She is my primary care.

12       Q    There are records that we obtained

13 from a family practice as well that you saw for a

14 long time.  Is that no longer your primary care

15 provider?

16       A    It is not.

17       Q    When did that change?

18       A    About a year ago.

19       Q    Okay.  Since about a year ago,

20 Ms. Nurse Clendenen has been your primary care

21 provider at Erlanger?

22       A    Yes.

23       Q    I've seen some references to -- well,

24 sorry.  Let me strike that question.

25            Were you receiving any treatment for

(423) 876-4435       "Preserving The Record"       (800) 298-3376
Whitney Vaughn      Angel & Associates Court Reporting
Case 1:22-cv-00162-DCLC-SKL   Document 31-2   Filed 03/01/24   Page 43 of 151   PageID #: 353

1 anxiety before December 15th, 2020?

2      A    No.

3      Q    I've seen some references to

4 post-traumatic stress disorder.

5      A    Yes.

6      Q    Is it your understanding that you have

7 that condition?

8      A    Yes.

9      Q    Who has diagnosed you with that

10 condition?

11      A    Kate Walter.

12      Q    And who is Kate Walter?

13      A    She is the nurse practitioner that

14 worked for the family practice.

15      Q    And when did she make this diagnosis?

16      A    Within a few days of the wreck.  I

17 don't know what date.

18      Q    And did she provide you any treatment

19 for that diagnosis?

20      A    Citalopram.

21      Q    Any other mental health history other

22 than anxiety --

23      A    No.

24      Q    -- and PTSD?  And we have obtained

25 medical records from some of your providers.  And I

(423) 876-4435        "Preserving The Record"       (800) 298-3376
Whitney Vaughn      Angel & Associates Court Reporting
Case 1:22-cv-00162-DCLC-SKL  Document 31-2  Filed 03/01/24  Page 44 of 151  PageID #: 354

1    just want to go through some of the conditions that

2    were listed just to get an understanding of those

3    conditions and how long you have experienced them,

4    one of which is Hashimoto's thyroiditis.  What --

5    when were you first diagnosed with that?

6            A    I don't know.  I -- I don't know the

7    date.

8            Q    Can you give a general year of when

9    you think that was?

10           A    Probably 2019.

11           Q    And what symptoms do you experience

12   with that condition?

13           A    A little bit of hand shaking, night

14   sweats, cold -- intolerance to cold, my fingers turn

15   white.

16           Q    And what medical provider diagnosed

17   you with that condition?

18           A    Kate Walter.

19           Q    And what treatment do you receive for

20   that condition?

21           A    It's called Synthroid.  Levothyroxine

22   is the one that I take.

23           Q    That's a medication?

24           A    Yes.

25                MR. FAIR:  Good luck with that one.

BY MR. FAIR:

     **Q    Do you know how to spell that?**

     A    No.

     **Q    Okay.  That's okay.  Another condition listed is high blood pressure?**

     A    Yes.

     **Q    How long have you experienced that?**

     A    Probably a couple years.

     **Q    Couple years from now?**

     A    Yeah.  I would say probably 2018 originally.  And then I got off of the medicine, and then now I'm back on some medicine.

     **Q    Okay.  Who originally diagnosed that?**

     A    Kate Walter.

     **Q    Do you know what medicine you were taking for it?**

     A    Right now I take 20 milligrams of Olmesartan and 25 milligrams of Hydralazine.

     **Q    And is that different from what you had taken before getting off of the medication?**

     A    Yes.

     **Q    Do you remember what you were taking before?**

     A    It's initials HCTZ, hydrochlorothiazide or something like that.

(423) 876-4435      "Preserving The Record"     (800) 298-3376
Whitney Vaughn    Angel & Associates Court Reporting
Case 1:22-cv-00162-DCLC-SKL   Document 31-2   Filed 03/01/24   Page 46 of 151   PageID #: 356

```
 1              Q       And do you experience any symptoms
 2    with your high blood pressure?
 3              A       No.
 4              Q       Did you ever at one point?
 5              A       Flushing in the face.  That's about
 6    it.
 7              Q       COPD?
 8              A       Yes.
 9              Q       How long have you had that condition?
10              A       Diagnosed in 2020.
11              Q       What month of 2020?
12              A       September, I would say.
13              Q       And what symptoms do you experience
14    with COPD?
15              A       Shortness of breath.
16              Q       And what medical provider first
17    diagnosed that?
18              A       Kate Walter.
19              Q       And do you receive any treatment for
20    that?
21              A       Yes.
22              Q       What's that?
23              A       Albuterol.
24              Q       Is that the inhaler?
25              A       Yes.  And Trelegy.
```

1          Q      **Are both of those inhaler medications?**

2          A      Yes.

3          Q      **Prediabetes?**

4          A      Yes.

5          Q      **Do you know when that was first**

6 **diagnosed?**

7          A      Probably a year ago.

8          Q      **By whom?**

9          A      Asma Khan.  Dr. Khan.

10        Q      **What type of medical provider is**

11 **Dr. Khan?**

12        A      She is an endocrinologist.

13        Q      **And what -- were there certain**

14 **symptoms you were experiencing that led to that**

15 **diagnosis?**

16        A      No.

17        Q      **Are you under any treatment for that**

18 **diagnosis?**

19        A      No.

20        Q      **Chronic kidney disease?**

21         A      Yes.

22        Q      **When were you first diagnosed with**

23 **that?**

24        A      March of this year.

25        Q      **Okay.**

(423) 876-4435        "Preserving The Record"        (800) 298-3376
Whitney Vaughn      Angel & Associates Court Reporting
Case 1:22-cv-00162-DCLC-SKL   Document 31-2   Filed 03/01/24   Page 48 of 151   PageID #: 358

1              A       Approximately.

2              Q       **And what symptoms do you experience**

3     **with chronic kidney disease?**

4              A       Just pain urinating and not a lot of

5     urine.

6              Q       **And which provider diagnosed that?**

7              A       Dr. Iqbal.

8              Q       **Is that a --**

9              A       He is a nephrologist.

10             Q       **Do you know how to spell his name?**

11             A       Uh-huh.  I-Q-B-A-L.

12             Q       **And did you seek out nephrologist care**

13    **based on those symptoms you mentioned earlier, the**

14    **urinary pain and the --**

15             A       No.

16             Q       **Okay.  How did you seek out**

17    **nephrologist care?**

18             A       When they did my blood work, my kidney

19    function -- there is two or three things that they --

20    they looked at.  And they sent me to -- Dr. Cassie

21    sent me to Dr. Iqbal.

22             Q       **Okay.  So the "they" who did your**

23    **blood work was Erlanger, Dr. Cassandra Clendenen?**

24             A       Yes.

25             Q       **And are you relating chronic kidney**

1  disease to the motor vehicle accident?

2          A    No.

3          Q    There is also a reference to a liver

4  cyst?

5          A    Yes.

6          Q    Okay.  When was that first discovered?

7          A    December 15th of 2020.

8          Q    Okay.  How was it discovered?

9          A    They did some kind of a scan like a CT

10  scan, and they -- they said that on the CT scan.

11          Q    Was that -- were you told that was an

12  incidental finding of that scan?

13          A    Yes.

14          Q    That was at UT?

15          A    Yes.

16          Q    And are you relating that to the motor

17  vehicle accident?

18          A    No.

19          Q    There are references to you having

20  COVID-19 soon before the motor vehicle accident; is

21  that correct?

22          A    Yes.

23          Q    Okay.  And we also looked at the

24  Social Security Administration records, and there was

25  a reference to complications of COVID-19 as part of

1 your disability claim, right?

2      A    Yes.

3      Q    What residual effects from COVID-19 do

4 you experience?

5      A    The kidney issue, the heart issue, and

6 the COPD.

7      Q    Okay.  What is the heart issue?

8      A    I have inflammation on the top

9 right-hand portion of my heart.

10      Q    Okay.  Do you experience chronic

11 fatigue as a residual effect of the COVID-19?

12      A    Yes.

13      Q    Do you experience memory loss as a

14 residual effect?

15      A    I believe I do have memory loss, yes.

16      Q    And then do you experience labored

17 breathing upon exertion --

18      A    Yes.

19      Q    -- from COVID-19?  Tell me about the

20 memory loss symptom.  How long have you had that?

21      A    Not very long.  I think it's more like

22 a fog.  Like if I wake up in the middle of the night,

23 I think it's more like a fog.

24      Q    And when you say not very long, when

25 do you believe this condition started?

(423) 876-4435       "Preserving The Record"      (800) 298-3376
Whitney Vaughn     Angel & Associates Court Reporting
Case 1:22-cv-00162-DCLC-SKL  Document 31-2  Filed 03/01/24  Page 51 of 151  PageID #: 361

1          A     A year ago.

2          Q     **Okay. And when you say it's like a**
3    **fog, help me understand that a little better, what**
4    **that means.**

5          A     I don't think I can explain it.  Like,
6    whenever I wake up in the middle of the night, it's
7    like I -- it's almost like I can't remember exactly
8    which side of the bed I'm on, and I always sleep on
9    one side of the bed.  I can't really explain it.

10         Q     **And has a medical provider related**
11   **that to the COVID-19?**

12         A     Yes.

13         Q     **Okay. What about migraine headaches?**
14   **How long have you experienced those?**

15         A     Since a couple months after the wreck.
16   I would say probably February of 2021.

17         Q     **You didn't experience migraine**
18   **headaches before the collision?**

19         A     I did back when I was a child, back
20   when I was a teenager, but I hadn't had any for 35 or
21   40 years.

22         Q     **Okay. I saw a reference in the Social**
23   **Security Administration records that you had**
24   **experienced migraines since your early 20s.  You**
25   **don't agree with that?**

1      A     No.

2      Q     There was also a reference -- well,

3  sorry.  Strike that.

4            Are you receiving any treatment for

5  your migraine headaches?

6      A     Yes.

7      Q     What treatment?

8      A     Nurtec and ZAVZPRET.  And I don't know

9  how to spell that.

10     Q     Is that an as-needed treatment or is

11 that a regular treatment?

12     A     It's an as needed.

13     Q     And who prescribes that?

14     A     Kimberly Smith.

15     Q     And what kind of provider is Kimberly

16 Smith?

17     A     She is a neurologist.

18     Q     Okay.  There was a reference in your

19 medical records to a cyst in your brain.

20     A     Yes.

21     Q     Are you relating this to the

22 collision?

23     A     I do.

24     Q     Okay.  Has a medical provider related

25 it to the collision?

```
 1              A     No.
 2              Q     Okay.  What symptoms have you
 3      experienced from the cyst in your brain?
 4              A     The headaches.
 5              Q     So you relate that to the migraine
 6      headaches?
 7              A     Yes.
 8              Q     That restarted after the collision
 9      from long ago, right?
10              A     Yes.
11              Q     Has a medical provider evaluated
12      whether the cyst in the brain is causing the migraine
13      headaches?
14              A     No.
15              Q     How was the cyst in your brain
16      discovered to your knowledge?
17              A     From an MRI.
18              Q     Who -- when was that MRI?  Where was
19      that?
20              A     April of 2021 and Kent Childs.
21              Q     And what type of provider is Kent
22      Childs?
23              A     He is an OB/GYN.
24              Q     What -- he did an MRI of your brain?
25              A     Yes.
```

1    **Q**  **An OB/GYN?**

2    A  Yes.

3    **Q**  **What was the reason for that at the**

4 **time?**

5    A  Headaches.

6    **Q**  **Okay.**

7    A  I want to tell you something.

8    **Q**  **Oh, sure, please.**

9    A  He thought that I had a pituitary

10 gland problem, and he found the cyst in my brain.

11    **Q**  **I see.  Okay.  Has there been any**

12 **discussion of any sort of procedure to remove or**

13 **drain the cyst?**

14    A  It's inoperable.

15    **Q**  **What about the liver cyst?  Are there**

16 **any procedures planned for that?**

17    A  No.

18    **Q**  **Are you aware of a diagnosis of**

19 **plantar fasciitis?**

20    A  I think I have it, but, no, nobody has

21 ever told me that.

22    **Q**  **No one has diagnosed that to your**

23 **knowledge?**

24    A  No.

25    **Q**  **Okay.  All right.  So tell me about**

(423) 876-4435   "Preserving The Record"   (800) 298-3376
Whitney Vaughn   Angel & Associates Court Reporting
Case 1:22-cv-00162-DCLC-SKL   Document 31-2   Filed 03/01/24   Page 55 of 151   PageID #: 365

1   low back pain.  How long have you experienced that?

2           A    Since the wreck.

3           Q    Okay.

4           A    December of 2020.

5           Q    So you didn't experience any low back

6   pain before the wreck?

7           A    No.

8           Q    Okay.  Is it your understanding that

9   you were diagnosed with degenerative disk disease in

10  your back?

11          A    Yes.

12          Q    Do you know what the term degenerative

13  means?

14          A    Not exactly, no.

15          Q    What's your general understanding of

16  what that means?

17          A    It happens over time.

18          Q    Okay.  If we go back to Exhibit 1,

19  page 9, we asked the question number 14 if you have

20  had any preexisting problems prior to the injuries in

21  your complaint.  And after an objection your response

22  was, I had some arthritis in my back prior to the

23  collision.  Tell me about your history of arthritis

24  in your back.

25          A    It just -- I felt like I just had

1    something going on in my back and especially when it

2    was cold.  No one told me I had that.  I just --

3    **Q    You were never diagnosed with**

4    **arthritis?**

5    A    No.

6    **Q    It's just your belief you had**

7    **arthritis?**

8    A    Yeah.

9    **Q    When did that start?**

10    A    I don't know.  Probably five or

11    ten years ago.  I don't -- I don't know.

12    **Q    And how did it manifest itself?  You**

13    **said there was pain when it was cold.  Anything else?**

14    A    No.

15    **Q    What's your understanding of the**

16    **condition bulging lumbar disks?  Have you been told**

17    **you have that?**

18    A    I have, yes.

19    **Q    Tell me what you understand about that**

20    **condition.**

21    A    That there is a decrease in the

22    material that separates your bones, that mine is

23    decreased.

24    **Q    And do you relate that to the motor**

25    **vehicle collision?**

(423) 876-4435        "Preserving The Record"        (800) 298-3376
Whitney Vaughn      Angel & Associates Court Reporting
Case 1:22-cv-00162-DCLC-SKL   Document 31-2   Filed 03/01/24   Page 57 of 151   PageID #:
367

```
1            A     Yes.

2            Q     Has a medical provider related that to

3      the collision?

4            A     Yes.

5            Q     Which provider?

6            A     Dr. Lowry.

7            Q     And what kind of provider is that?

8            A     He is an orthopaedic doctor

9      specializing in the shoulder and the back.

10           Q     Does he provide any treatments for

11     that condition?

12           A     Yes.

13           Q     What treatments?

14           A     I've had numerous injections in my

15     back.  I've had facet injections in my lower back.  I

16     think methocarbamol also came from him originally.

17           Q     Is he at Erlanger?

18           A     He is, yes.

19           Q     How does your low back pain affect you

20     on a daily basis?

21           A     It's difficult to pick stuff up, and

22     it just hurts.  My lower back just hurts.

23           Q     It's just a constant pain?

24           A     Yes.

25           Q     Is it hurting right now?
```

```
 1          A     Yes.

 2          Q     Another -- another reference is right

 3   knee pain.

 4          A     Yes.

 5          Q     Is it your understanding that you have

 6   osteoarthritis in your right knee?

 7          A     I haven't -- they didn't tell me that.

 8          Q     You have not been told that by a

 9   medical provider?

10          A     (No response.)

11          Q     What about the condition bursitis in

12   the right knee?  Have you been told that?

13          A     No.

14          Q     So you have no understanding of those

15   conditions as it relates to you?

16          A     No.

17          Q     Osteoarthritis or bursitis?  There is

18   also a reference to a peripheral tear of the medial

19   meniscus.

20          A     Yes.

21          Q     Are you aware of that condition?

22          A     Yes.

23          Q     What's your understanding of how that

24   occurred?

25          A     From the accident.
```

1          Q      Okay.  The 12/15/20 collision?

2          A      Yes.

3          Q      And what -- what physicians are

4   treating you for this condition?

5          A      Currently, Mark Freeman.

6          Q      Okay.  Is that also an orthopaedic

7   surgeon?

8          A      Yes.

9          Q      At Erlanger?

10         A      Yes.

11         Q      So he is handling the knee piece and

12  Dr. Lowry is handling the back piece?

13         A      Yes.

14         Q      Have you undergone any treatment on

15  your right knee?

16         A      Yes.

17         Q      What treatment?

18         A      I had numerous injections, and then I

19  had a total knee replacement which has now failed.

20  I've been on this walker now for nine months.

21  Dr. Jeremy Bruce did the original knee replacement,

22  and now we have Dr. Freeman.

23         Q      Do you have any understanding as to

24  the cause of the failure of that replacement?

25         A      No.

1        **Q**     **Is there a plan for additional**

2 **surgery?**

3        A     Yes.

4        **Q**     **Is that scheduled?**

5        A     Yes.

6        **Q**     **When is that scheduled?**

7        A     December 15th.

8        **Q**     **That's not the greatest date, but I**

9 **understand.  It's coming up at least.  And what is**

10 **the surgery that's planned on December 15th?**

11       A     Removal of the portion of my knee that

12 has been replaced and a new one put in.

13       **Q**     **Is it believed that there is infection**

14 **in your knee to your understanding?**

15       A     Originally, yes, but we don't think

16 that now.

17       **Q**     **Okay.  And how do your knee problems**

18 **affect you on a daily basis?**

19       A     I can't walk.  It affects everything

20 about me.

21       **Q**     **Before the knee replacement surgery**

22 **that you underwent previously, were you able to walk**

23 **on that knee?**

24       A     I could walk, yes.

25       **Q**     **And you may have said this.  I**

(423) 876-4435       "Preserving The Record"       (800) 298-3376
Whitney Vaughn      Angel & Associates Court Reporting
Case 1:22-cv-00162-DCLC-SKL   Document 31-2   Filed 03/01/24   Page 61 of 151   PageID #: 371

1    apologize if you did.  When was that knee replacement

2    surgery?

3              A    March 7th of 2023.

4              Q    And then left shoulder pain.  Tell me

5    when that started.

6              A    The wreck, December the 15th, 2020.

7              Q    And what's your understanding of the

8    condition in your left shoulder?

9              A    I have bulging disks in my neck and a

10   pinched nerve in my shoulder.

11             Q    Are you familiar with the condition

12   subacromial bursitis?

13             A    No.

14             Q    It's not your understanding that you

15   have that condition?

16             A    I have never heard that before.

17             Q    Have you been informed that you have

18   biceps tendinitis?

19             A    No.

20             Q    Have you been informed that you have

21   left rotator cuff disorder?

22             A    No.

23             Q    And you relate all of your left

24   shoulder pain to the accident, correct?

25             A    Yes.

1       **Q**    **Did you have any left shoulder pain**

2  **prior to the accident?**

3       A    No.

4       **Q**    **How does this left shoulder pain**

5  **affect you on a daily basis?**

6       A    My arm goes numb and I just have pain

7  in it.

8       **Q**    **Does it go numb just sitting normally**

9  **or is it in certain positions that you're in where it**

10  **goes numb?**

11       A    Sitting normally, yes.  It just goes

12  numb.

13       **Q**    **Yeah.  Where does the numbness end?**

14       A    Right here.

15       **Q**    **Okay.  It doesn't go all the way down**

16  **your arm?**

17       A    No.

18       **Q**    **And then right ankle pain.  Do you**

19  **have right ankle pain?**

20       A    Not anymore.

21       **Q**    **Okay.  Did -- at one point did you?**

22       A    Yes.

23       **Q**    **When did that start?**

24       A    The day of the wreck.

25       **Q**    **When did that end?**

(423) 876-4435       "Preserving The Record"       (800) 298-3376
Whitney Vaughn       Angel & Associates Court Reporting
Case 1:22-cv-00162-DCLC-SKL   Document 31-2   Filed 03/01/24   Page 63 of 151   PageID #:
373

1        A      Probably March.

2        Q      March of 2021?

3        A      Yes.

4        Q      Were you told of any condition in your

5   right ankle that was causing that pain?

6        A      I had an MRI and it revealed that I

7   had a broke bone and a -- some kind of a tear or a

8   tendon or something.

9        Q      Did you receive any treatment for

10  that?

11       A      Yes.

12       Q      What treatment?

13       A      I wore a little boot on my foot,

14  especially at night.

15       Q      Okay.  Just briefly want to cover

16  surgeries that you have undergone.  We talked about

17  the right knee surgery in March of this year.  My

18  understanding from the records, you had a previous

19  partial hysterectomy, correct?

20       A      I had a total hysterectomy.

21       Q      Total.  I saw partial somewhere.  So

22  total hysterectomy?

23       A      Yes.

24       Q      You had your gallbladder removed?

25       A      Yes.

1      **Q     When was that?**

2      A     November of 2022.

3      **Q     That was Dr. Dunn?**

4      A     Yes.

5      **Q     Tennova?**

6      A     Yes.

7      **Q     Do you agree that -- well, what was**

8 **the condition that caused you to have your**

9 **gallbladder removed, to your understanding?**

10     A     He said it was just defective.  It --

11 I was vomiting, just all kinds of stuff going on with

12 my belly.  Just pain in my stomach.

13     **Q     And you're not relating that to the**

14 **collision?**

15     A     Oh, no.

16            MR. KUHLMAN:  The hysterectomy is.

17            MR. FAIR:  Okay.

18            MR. KUHLMAN:  Spencer, we've been

19 going about an hour and 15 minutes.  Do you mind if

20 we take --

21            MR. FAIR:  Don't mind.

22            MR. KUHLMAN:  -- a break?

23            MR. FAIR:  Yeah.

24            (Whereupon, a short break was had.)

25 //

(423) 876-4435        "Preserving The Record"        (800) 298-3376
Whitney Vaughn      Angel & Associates Court Reporting
Case 1:22-cv-00162-DCLC-SKL   Document 31-2   Filed 03/01/24   Page 65 of 151   PageID #:
375

1    BY MR. FAIR:

2          Q    When we -- right before we took a

3    break I was asking you about surgery history and we

4    discussed your complete hysterectomy, your right knee

5    surgery in March of this year, and your gallbladder

6    removal in November of 2022.  Any other surgeries

7    that you have had at least in the last ten years?

8          A    No.

9          Q    Okay.

10         A    No.

11         Q    All right.  I'm going to show you a

12   few records here from the family practice provider.

13   This first one is from a visit on November 2nd, 2020.

14   And this was a month and a half before the collision.

15   Does that appear to be that record to you?  Do you

16   see the visit date?

17         A    Yes.

18              MR. FAIR:  Okay.  Let's go ahead and

19   mark that one 5 and we'll talk about it a little bit.

20              (Whereupon, the document, as referred

21   to above, was marked and subsequently attached hereto

22   as Exhibit No. 5.)

23   BY MR. FAIR:

24         Q    So it looks like the reason for this

25   visit relates to your COVID diagnosis.  Does that

1  appear to be correct?

2          A     Yes.

3          Q     And here there are -- I'm sorry.

4  There is a past medical history on the first page.

5  Do you see that?

6          A     Yes.

7          Q     The conditions listed on that date:

8  Hypothyroid, hypertension, hyperlipidemia, elevated

9  liver enzymes, Vitamin B-12 deficiency, Vitamin D

10  deficiency, prediabetes, Hashimoto's thyroiditis, and

11  COVID-19.  Did I read those correctly?

12          A     Yes.

13          Q     And it looks like your complaint is

14  that you're still experiencing symptoms from COVID at

15  this time, correct?

16          A     Yes.

17          Q     Do you remember this visit with the --

18  with your provider?

19          A     Yes.

20          Q     Okay.  That day -- if you look at the

21  last page of Exhibit 5, there is a -- there is some

22  prescriptions given to you that day.  Do you see that

23  on the third page?

24          A     Yes.

25          Q     And the third -- the third

1   prescription given to you that day, cyclobenzaprine.

2   And it says PRN for back pain, right?

3          A    Yes.

4          Q    What back pain would you have been

5   experiencing November 2020?

6          A    I don't remember.

7          Q    Okay.  But do you dispute that you

8   were given a medication for back pain that day?

9          A    I do not dispute that, no.

10              MR. FAIR:  All right.  We'll move on

11  to the next one.  We'll go ahead and make that

12  Exhibit 6.

13              (Whereupon, the document, as referred

14  to above, was marked and subsequently attached hereto

15  as Exhibit No. 6.)

16  BY MR. FAIR:

17         Q    This is 11 -- November 4, 2020, date

18  with your family provider, correct?

19         A    Yes.

20         Q    And this -- in the history of present

21  illness section, you state that you were having

22  lingering shortness of breath.  Do you see that?

23         A    Not yet, but I will.

24         Q    Okay.

25              MR. KUHLMAN:  You want to rephrase

1    it?

2                    MR. FAIR:  Sure.

3    BY MR. FAIR:

4        Q    Within the history of present illness

5    section, COVID-19 follow up.  It's a follow up from

6    the COVID infection.  The second sentence says,

7    States SOB -- which I assume means shortness of

8    breath --

9        A    Yes.

10       Q    -- and not something else -- has

11   lingered.  Feel like I cannot get a full breath.

12   Does that -- does that appear correct to you?

13       A    Yes.

14       Q    Do you remember having those symptoms

15   at that time?

16       A    Yes.

17       Q    Tell me what you remember about those

18   symptoms.

19       A    I remember I was coughing a lot.  And

20   when I walked, I couldn't get a full breath in.

21       Q    Uh-huh.  And then towards the end of

22   that same section it says, Numbness to hands, legs,

23   tingling, my feet and hands look white and blue, and

24   legs and feet feel really cold.  Did I read that

25   correctly?

1        A     Yes.

2        **Q     Do you remember having those**

3 **conditions at that time?**

4        A     Yes.

5        **Q     Tell me what you remember about those**

6 **other than what it says.**

7        A     I remember my hands were turning that

8 white color and then they would be blue.  And we both

9 think that it could have been related to the

10 Hashimoto's.

11       **Q     We both, you and your provider?**

12       A     Yes.

13       **Q     Also, just below that paragraph there**

14 **is another paragraph that says, Hypertension FU,**

15 **which I assume means follow up.**

16       A     Yes.

17       **Q     Do you see that?**

18       A     Yes.

19       **Q     The first sentence:  Patient reports**

20 **having other symptoms such as shortness of breath and**

21 **visual changes.  Did I read that correctly?**

22       A     Yes.

23       **Q     Do you remember experiencing visual**

24 **changes at that time?**

25       A     No.

(423) 876-4435         "Preserving The Record"       (800) 298-3376
Whitney Vaughn     Angel & Associates Court Reporting
Case 1:22-cv-00162-DCLC-SKL   Document 31-2   Filed 03/01/24   Page 70 of 151   PageID #: 380

1         **Q**    **You don't have any recollection of**

2 **that so you couldn't describe what those changes**

3 **were?**

4         A    No.

5         **Q**    **And then at the end of that same**

6 **paragraph it says that you felt a bit dizzy?**

7         A    Yes.

8         **Q**    **Do you remember feeling dizzy at that**

9 **time?**

10         A    Yes.

11         **Q**    **Tell me what you remember about that.**

12         A    I remember my blood pressure was

13 really low and heart rate kind of low and I was a

14 little bit dizzy.

15         **Q**    **Yeah.  Were there certain moments that**

16 **you felt dizzier than others like when you stood up?**

17         A    Yes.  Standing up.

18         **Q**    **That was the main time.  Okay.  And**

19 **then on the last page for the dyspnea -- which I**

20 **think that's the shortness of breath.  I think that's**

21 **just a fancy way of saying that.**

22         A    Yes.

23         **Q**    **They ordered a CT scan of your chest,**

24 **right?**

25         A    Correct.

(423) 876-4435        "Preserving The Record"       (800) 298-3376
Whitney Vaughn     Angel & Associates Court Reporting
Case 1:22-cv-00162-DCLC-SKL   Document 31-2   Filed 03/01/24   Page 71 of 151   PageID #: 381

1        **Q**    **Do you remember that being ordered?**

2        A    Yes.

3        **Q**    **And then one more from the PCP.**

4            MR. KUHLMAN:  Was that -- were we

5  on -- was that 6?

6            MR. FAIR:  That was Exhibit 6 and

7  that was the 11/4 visit date.  And then we'll go

8  ahead and mark that 7 for me.

9            (Whereupon, the document, as referred

10  to above, was marked and subsequently attached hereto

11  as Exhibit No. 7.)

12  BY MR. FAIR:

13        **Q**    **So this -- what we marked as Exhibit 7**

14  **has an 11/5/2020 visit date, correct?**

15        A    Yes.

16        **Q**    **And that would have been the day after**

17  **Exhibit 6.  And it's a followup from your chest CT**

18  **scan, right?**

19        A    Yes.

20        **Q**    **According to the COVID-19 followup**

21  **paragraph on the first page, you state that you're**

22  **still having the shortness of breath.  Do you**

23  **remember that?**

24        A    Yes.

25        **Q**    **And then if we go to the last page of**

(423) 876-4435        "Preserving The Record"        (800) 298-3376
Whitney Vaughn       Angel & Associates Court Reporting
Case 1:22-cv-00162-DCLC-SKL   Document 31-2   Filed 03/01/24   Page 72 of 151   PageID #: 382

1    that, the assessment for the dyspnea, the shortness

2    of breath, this -- the second sentence says, The CT

3    chest does show ground glass patches throughout

4    bilateral lungs.  Radiologist stated DD -- I don't

5    know what DD is -- COVID-19-induced pneumonia.  Do

6    you remember being diagnosed with pneumonia?

7         A    Yes.

8         Q    And the plan was you were advised to

9    go to the closest emergency room?

10        A    Yes.

11        Q    Do you recall that?

12        A    Yes.

13        Q    Did you go?

14        A    Yes.

15        Q    Where did you go at that time?

16        A    CHI Memorial.

17        Q    Where is that located?

18        A    It's in Chattanooga.  I would say

19   that's north, northeast.

20        Q    Okay.  Do you remember how long you

21   were there for that visit?

22        A    Several hours.

23        Q    Several hours.  And do you remember

24   what treatment you received?

25        A    Breathing treatment.  I think that's

1    all.

2            Q       Okay.

3            A       Isolation and a breathing treatment.

4            Q       All right.  I think we're done with

5    that now.  So that was November 5th, 2020.  And we're

6    going to -- we're going to now go forward towards the

7    time of the accident, a month and ten days after

8    that.  And let's talk a little bit about just your

9    history with driving.  Have you ever had any other

10   motor vehicle collisions?

11           A       Yes.

12           Q       How many would you estimate you have

13   had?

14           A       Two.

15           Q       When would those other two have

16   occurred?

17           A       2005 and 2022.

18           Q       Okay.

19           A       No, no, no.  2020.

20           Q       Do you remember when -- around when in

21   2020 that second one occurred?

22           A       I think it was in February.

23           Q       And the 2005 accident, do you remember

24   when that -- where that was?  I'm sorry.

25           A       I know where it was, yes.

1          **Q     Where was it?**

2          A     It was on Georgetown Road at 17th

3 Street.

4          **Q     Is that in Athens?**

5          A     Oh, no.  I'm sorry.  It's in

6 Cleveland.  No.

7          **Q     In Cleveland.  Okay.  And then the**

8 **February 2020 accident, do you remember where that**

9 **was?**

10         A     Yes.

11         **Q     Where was that?**

12         A     In my driveway.

13         **Q     Okay.  What did you hit in your**

14 **driveway?**

15         A     I didn't hit anything.

16         **Q     What was hit -- what was the**

17 **collision?  Explain it to me.**

18         A     I was turning on -- off of Highway 30

19 into my driveway, and a vehicle come off the road and

20 hit me in my driveway.  He hit the front of my truck.

21         **Q     A vehicle came off of Highway 30?**

22         A     Yes.

23         **Q     Was the truck you were driving then**

24 **the same truck involved in the December 15th --**

25         A     No.

(423) 876-4435         "Preserving The Record"         (800) 298-3376
Whitney Vaughn         Angel & Associates Court Reporting
Case 1:22-cv-00162-DCLC-SKL   Document 31-2   Filed 03/01/24   Page 75 of 151   PageID #: 385

1      Q      -- accident?  What type of truck was

2  that?

3      A      2013 F-150 pickup.

4      Q      Okay.  Have you ever been cited as the

5  person at fault in a collision?

6      A      No.

7      Q      What happened in the 2005 accident?

8      A      I was sitting on Georgetown Road

9  waiting for cars to turn to the left.  There was a

10  couple of cars in front of me and a vehicle come

11  across the hill and hit me in the rear end.

12      Q      Okay.  Have you ever been cited for

13  any moving traffic violations?

14      A      Yes.

15      Q      How many would you estimate you have

16  been --

17      A      One.

18      Q      What was the citation?

19      A      Speeding.

20      Q      Okay.  When was that?

21      A      1998.

22      Q      I know you're making faces as if you

23  have done something wrong, but I'm sure if we look

24  around this room, we can all relate to that.  1998

25  for speeding.  Do you remember --

```
 1              MR. KUHLMAN:  Assumes facts not in
 2     evidence.
 3              MR. FAIR:  Sure.
 4     BY MR. FAIR:
 5         Q    Do you remember what speed you were
 6     told you were going and what type of speed zone?
 7         A    Yes.
 8         Q    What was it?
 9         A    I was running 98 miles an hour in a
10     55.
11         Q    Where was this located?
12         A    Harrison Pike.  Not Harrison Pike.
13     Highway 58 in Harrison.
14         Q    And would you agree you were going
15     that speed?
16         A    Yes.
17         Q    What was the reason for that speed?
18         A    I was happy.
19         Q    Okay.  Have you ever been injured as a
20     result of a different motor vehicle collision?
21         A    Yes.
22         Q    Which one were you injured in?
23         A    The 2005.
24         Q    What kind of injuries did you
25     experience?
```

1        A     It made my neck hurt.  I was hit in

2  the rear end.  It just made my neck hurt.

3        **Q**     **Did you have to go to the hospital?**

4        A     No, I did not go to the hospital.

5        **Q**     **And did you receive any treatment that**

6  **you recall?**

7        A     Chiropractor.

8        **Q**     **Did you receive any money from either**

9  **of those accidents?**

10       A     Yeah.  Yeah.

11       **Q**     **Any recollection of the amount?**

12       A     $10,000.  I don't know.

13       **Q**     **Which one or both?**

14       A     The one in 2005.

15       **Q**     **The one where you had the injury?**

16       A     Yes.

17       **Q**     **You believe you received around**

18  **$10,000.  And did you have to file a lawsuit or was**

19  **that just a settlement of the --**

20       A     Settlement.

21       **Q**     **-- insurance?  Now, we discussed**

22  **earlier that your home now and at the time is very**

23  **close to the scene of the collision, right?**

24       A     Yes.

25       **Q**     **How far would you say it is from**

(423) 876-4435        "Preserving The Record"        (800) 298-3376
Whitney Vaughn       Angel & Associates Court Reporting
Case 1:22-cv-00162-DCLC-SKL   Document 31-2   Filed 03/01/24   Page 78 of 151   PageID #: 388

1    there?

2         A    It's 1.8 miles there and back.

3         Q    And you have lived there for six

4    years?

5         A    Yes.

6         Q    Agree that you're very familiar with

7    Highway 30?

8         A    Yes.

9         Q    What about the turn -- the road

10   intersecting?  Are you familiar with that road?  Do

11   you use that road for any frequent reasons?

12         A    The intersecting?

13         Q    The road that intersects with

14   Highway 30 that the military driver was -- let me

15   just strike the question.

16             That intersection, do you utilize that

17   intersection very often?

18         A    No.

19         Q    Do you have familiarity with the

20   military field maintenance shop off of Highway 30?

21         A    I know where it's at, yes.

22         Q    Is it -- is it unusual to see military

23   vehicles on that highway?

24         A    It is very unusual.

25         Q    Okay.  If we go back to the month

(423) 876-4435         "Preserving The Record"        (800) 298-3376
Whitney Vaughn       Angel & Associates Court Reporting
Case 1:22-cv-00162-DCLC-SKL  Document 31-2  Filed 03/01/24  Page 79 of 151  PageID #: 389

1  before the collision, walk me through just like a
2  normal day in your life.  What was -- what would you
3  do on a normal day?

4       A    Get up, take care of the dogs,
5  straighten the house up.  I was still recovering from
6  the COVID one month before that, but I was getting
7  better.  I was getting much better.

8       Q    Okay.  What were your hobbies at that
9  time?

10      A    I don't think I had any hobbies.

11      Q    Okay.  When you aren't working --
12  well, I shouldn't say aren't.  At the time when you
13  weren't working, what would you do with your spare
14  time?

15      A    Danny and I go to auctions, shooting
16  range, Gatlinburg, going to visit my family, going to
17  visit our stepson, that kind of stuff.

18      Q    Now let's actually talk about December
19  15th, 2020.

20      A    Yes.

21      Q    What vehicle were you driving that
22  day?

23      A    A Dodge 3500 Ram.

24      Q    And how long had you driven that
25  vehicle prior to that day?

1            A      A year and four months, ever how long
2     we had it.
3            Q      Was that your primary vehicle?
4            A      No.
5            Q      What was your primary vehicle at the
6     time?
7            A      A 2011 Ford Mustang GT.
8            Q      Why were you driving that -- the Dodge
9     that day?
10           A      I had several things to take to my
11    mom's.  I was going to see my mom.  I hadn't seen her
12    for several months, and I had accumulated several
13    things to take to her and I was headed to see her.  I
14    almost left in the Mustang, and then I changed my
15    mind and I moved all the stuff into the Dodge and I
16    drove it.
17           Q      Where does your mom live?
18           A      She lives in Linsdale.  She lives
19    about 14 or 15 miles from our house.
20           Q      Okay.  How was the weather that day?
21           A      Beautiful.
22           Q      About what time was it for the
23    collision?
24           A      9:45-ish in the morning.
25           Q      So what time did you get up that

1  morning or what time would you normally get up on a
2  morning like that?

3          A     About 7:30 that morning.

4          Q     So walk me through what you did that
5  morning prior to leaving that you can recall.

6          A     I took the dogs out.  I moved all the
7  stuff from the Toyota over to the Dodge, and I talked
8  to my neighbor because they were just moving in, and
9  then I left.

10         Q     What was the -- what neighbor?  What
11 was that person's name?

12         A     Amy.

13         Q     Amy?

14         A     Amy, A-M-Y.

15         Q     Sorry.  Do you know her last name?

16         A     I do know her last name, but I can't
17 say it.  It's Guillot or something like that.  She is
18 from --

19         Q     Unsure how you say it?

20         A     Yeah.  I know how to spell it.

21         Q     Starts with a G?

22         A     Yeah.

23         Q     How do you spell it?

24         A     G-U-I-L-L-O-T.

25         Q     Okay.  Kind of a Louisiana flair, it

1    sounds like?

2           A    Yes, sir.

3           Q    And so you were leaving your house at

4    the time of the accident?

5           A    Yes.

6           Q    And you were going to your mother's

7    in -- what was the name of that town?

8           A    Linsdale.

9           Q    Linsdale.  Were you utilizing your

10   cell phone in any manner at the time of the

11   collision?

12          A    No.

13          Q    What was your phone number on that

14   day?

15          A    (423) 505-9918.

16          Q    And what was your mobile carrier?

17          A    Verizon.

18          Q    Is that -- do you still have the same

19   number and carrier?

20          A    Yes.

21          Q    Okay.  So in as much detail as

22   possible, I want you to just tell me in your own

23   words what happened with the collision.

24          A    I left my house, went toward Etowah,

25   which is southeast, I believe.  I saw the military

1   vehicle.  He was already on Highway 30 whenever I
2   pulled out.  We got up close to where the accident
3   happened and a vehicle pulled out onto Highway 30.  I
4   moved over into the left-hand lane.  He still was in
5   the right -- and I'm talking about the military
6   vehicle was still in the right-hand lane.  And that
7   car made a U-turn and turned around and went back
8   toward Athens.

9           I got up closer to where the military
10  vehicle was.  He made a right-hand turn and
11  immediately made a left-hand turn and drove straight
12  into the side of my vehicle.

13      **Q      So it's your testimony that he was not**
14  **in the left lane at any time?**

15      A      Not until he was crossways of the
16  road.

17      **Q      What would you estimate your vehicle**
18  **speed at the time of the collision?**

19      A      I would say 45 to 50 miles an hour.

20      **Q      And what's the speed limit there?**

21      A      Fifty-five.

22      **Q      And could you estimate what his speed**
23  **was at the time?**

24      A      Not very fast.

25      **Q      Considerably slower than 45 to 50,**

1    would you guess?

2           A     I would say probably 35 to 45.

3           Q     Could you estimate about how far your

4    vehicle was from the military vehicle at the time he

5    started his turn?

6           A     Maybe 75- to 100-foot.  I don't really

7    know, but that's what -- a few car lengths.

8           Q     And is it your testimony that you

9    remained in the left lane the entire time?

10          A     Yes.

11          Q     At any time did you enter the turning

12   lane at the intersection?

13          A     No.

14          Q     Do you know if the military vehicle

15   had the turn signal on?

16          A     He did not.

17          Q     Okay.  It's your testimony that he did

18   not?

19          A     No.

20          Q     Do you know whether it was on -- the

21   turn signal was on in the roadway after the

22   collision?

23          A     It was not.

24          Q     You did not see it on at any time?

25          A     No.

86

1          Q    Okay.  You -- so if you did not see
2    the turn signal on at any time, you would agree that
3    the military vehicle did not have a right turn signal
4    on at any time?
5          A    No, he did not.
6          Q    Okay.  I want to show you -- this was
7    something that I found on Google Maps.  And my
8    understanding is that this is the intersection where
9    the collision occurred.
10         A    Yes.
11         Q    Would you agree with that?
12         A    Yes.
13              MR. FAIR:  You do.  Okay.  Let's go
14   ahead and mark it 8.
15              (Whereupon, the document, as referred
16   to above, was marked and subsequently attached hereto
17   as Exhibit No. 8.)
18   BY MR. FAIR:
19         Q    And if we're looking at this map and
20   we're holding it this way like right side up, would
21   you have been traveling in the direction of the road
22   on the right or shall we turn it upside down?
23         A    It needs to go like this.
24         Q    So let's turn it upside down.  And as
25   we look at this upside down, the lanes on the right

(423) 876-4435                "Preserving The Record"                (800) 298-3376
Whitney Vaughn              Angel & Associates Court Reporting
Case 1:22-cv-00162-DCLC-SKL  Document 31-2  Filed 03/01/24  Page 86 of 151  PageID #:
396

1  were the lanes that you -- that was the side of the

2  road you were traveling?

3          A     Yes.

4          Q     And this intersection was the

5  intersection where the military vehicle was making a

6  left -- made a left turn into you, right?

7          A     Yes.

8          Q     Okay.  Could you mark to the best of

9  your ability where you think your vehicle was and

10 where you think the military vehicle was at the time

11 of the collision?

12                  MR. KUHLMAN:  I don't mind for her to

13 mark it and I don't mind for you to use it, but we're

14 going to reserve an objection.

15                  MR. FAIR:  I understand.  Yeah.  I

16 totally understand.  And if that pen is not

17 working --

18                  MR. KUHLMAN:  Do you need me to

19 elaborate?

20                  MR. FAIR:  I don't need you to

21 elaborate.  It's totally okay.

22                  MR. KUHLMAN:  Okay.

23 BY MR. FAIR:

24         Q     So let me see what you have done here.

25 You have marked with an X where your vehicle was at

1 the time of the collision and with essentially a

2 hyphen where the military vehicle was at the time of

3 the collision, correct?

4   A Yes.

5   Q Okay.  And I understand this is your

6 estimate.  And I -- I know this isn't an exact

7 location.  This is just what you recall looking at

8 this picture, right?

9   A Yes.

10   Q Okay.  Where was your vehicle damaged?

11 Where on your vehicle was there damage?

12   A The passenger side where the bed meets

13 the cab.

14   Q Okay.  And this probably goes without

15 saying, but I feel like I need to ask it.  There was

16 no one with you in the vehicle, right?

17   A No.

18   Q And were you able to observe where

19 there was damage on the military vehicle?

20   A Yes.

21   Q Do you recall where that was on the

22 military vehicle?

23   A On the driver's side right under the

24 driver side window, the windshield, and the corner

25 where the door comes together.

(423) 876-4435    "Preserving The Record"    (800) 298-3376
Whitney Vaughn    Angel & Associates Court Reporting
Case 1:22-cv-00162-DCLC-SKL   Document 31-2   Filed 03/01/24   Page 88 of 151   PageID #:
398

1     Q     Okay.  And have you read the police
2  report describing the collision?
3     A     Yes.
4     Q     My understanding is there are two.
5  There was -- there was one that was essentially
6  amended in January 2021.  And there was also one that
7  was created December 18th.  So December 18th, 2020;
8  January 10, 2021.  Were you aware of that?
9     A     Yes.
10    Q     Okay.  Do you have any idea why it was
11 amended?
12    A     Yes.  I -- they did not talk to me.
13 They did not ask me what happened.  I don't know
14 where she got her information from, but they amended
15 it because the information wasn't correct.
16    Q     Okay.  So on the scene of the
17 accident, you didn't speak with the trooper?
18    A     No.
19    Q     So the original police report that has
20 the December 18th, 2020, date does not contain your
21 side of the story; is that fair?
22    A     It does not.
23    Q     Okay.  And how -- did you reach -- was
24 there some discussion with the trooper about, hey,
25 you're not -- I've seen this report and you're not --

1　　you don't have my side of the story, I want to -- how

2　　did that happen?

3　　　　　A　　I never talked to her.  She has yet to

4　　call me.  I have never talked to her.  My former

5　　attorney talked to her.  And the best of my

6　　knowledge, she was supposed to change it and come and

7　　talk to me, but she did not.  I have never talked to

8　　her.

9　　　　　Q　　Okay.  So any amendment that was done

10　　to this did not occur as a result of a discussion you

11　　had with the trooper?

12　　　　　A　　No.

13　　　　　　　　MR. FAIR:  Okay.  Let's -- let's

14　　start with the amended one since that's the one that

15　　had the final one, I suppose.  And I just want to

16　　look at this with you.  We'll go ahead and mark it 9

17　　before we look at it.

18　　　　　　　　(Whereupon, the document, as referred

19　　to above, was marked and subsequently attached hereto

20　　as Exhibit No. 9.)

21　　BY MR. FAIR:

22　　　　　Q　　This document I have at least, it

23　　starts with page 2 of 6.  Do you see that at the

24　　bottom?

25　　　　　A　　Mine says 1 of 6.

1          MR. FAIR:  Well, maybe I just didn't

2    print off -- does yours say 1 of 6, too?

3          MR. KUHLMAN:  Well, you've --

4          MR. FAIR:  Maybe my copy doesn't --

5    that's okay.  No problem.

6    BY MR. FAIR:

7          Q    If you'll go to page 6 of 6 of what I

8    have given you.  No.  Sorry.  The one before that.

9    Let me make sure I have given you the right one.

10   Okay.  Does it say amendment made 1/9/2021 right

11   below that?

12         A    Yes.

13         Q    Do you see the narrative on this page

14   of Exhibit 7 -- sorry -- Exhibit 9?

15         A    Yes, I see it.

16         Q    Have you read this before?

17         A    I believe I have seen this, yes.

18         Q    Okay.  You're welcome to read it right

19   now, but do you have any disagreement with the

20   trooper's description of the collision?

21         A    I want to know am I being called 1 or

22   2?

23         Q    You are being called vehicle 1 and the

24   military vehicle is being called vehicle 2, and that

25   correlates with earlier in the report.

1          MR. KUHLMAN:  There is a table if you
2    want to -- if you need him to re-ask you the question
3    again, you can --
4          THE WITNESS:  I do.
5          MR. KUHLMAN:  -- but he is not asking
6    you about this diagram.  He is asking you --
7          MR. FAIR:  We'll get --
8          MR. KUHLMAN:  -- about --
9          MR. FAIR:  -- to the diagram.
10         MR. KUHLMAN:  -- that statement right
11   there.
12   BY MR. FAIR:
13      Q    The narrative that's on page 6 of 6,
14   will you please read that and let me know if you
15   disagree with --
16         MR. KUHLMAN:  Can we stop for just a
17   second?  I'm sorry to interrupt.
18         MR. FAIR:  Yeah, sure.
19         (Whereupon, an off-record discussion
20   was had.)
21   BY MR. FAIR:
22      Q    So the narrative on page 6 of 6, let
23   me know if you disagree with its contents.
24      A    I think generally it is -- the
25   information I think generally is correct.

1          Q     Okay.  You agree with the statement
2    that the military vehicle was attempting to make a
3    left turn?
4                 MR. KUHLMAN:  Calls for speculation.
5          A     I don't know what he was doing.
6    BY MR. FAIR:
7          Q     Okay.  Not sure.  Do you -- would you
8    agree or disagree that vehicle 2 had to make a wide
9    turn due to the size of the vehicle?
10                MR. KUHLMAN:  Same objection.
11         A     Again, I don't...
12   BY MR. FAIR:
13         Q     Okay.  Would you agree or disagree
14   that you attempted to pass the military vehicle?
15         A     Well, I was in the fast lane, so,
16   yeah, I was trying to go around him.
17         Q     Let's look at the drawing, because you
18   saw it and pointed something out.  Do you have a
19   disagreement with the drawing in Exhibit 9?
20         A     Well, I -- yes, I do.
21         Q     What's your disagreement with this
22   drawing?
23         A     I think my vehicle was more over here
24   like in this area, and his --
25                MR. KUHLMAN:  Don't mark on that.

```
 1                    THE WITNESS:  I won't.
 2   BY MR. FAIR:
 3           Q     You think your vehicle was more
 4   towards the middle of the left lane rather than over
 5   to the left side of the left lane?  Is that what
 6   you're indicating?
 7           A     Yes.
 8           Q     Anything else you disagree with in
 9   this drawing?
10           A     Well, I can tell you that his vehicle
11   did not hit me in the cab area.  It didn't hit me on
12   the doors.  It hit me more in this area right here.
13           Q     The --
14           A     Back.
15           Q     Back further than it shows on this
16   drawing, not --
17           A     Exactly.
18           Q     Back towards the rear of the vehicle
19   more rather than towards the front of the vehicle
20   more?  Is that what you're saying?
21           A     Yes.
22           Q     Okay.
23           A     I can also tell you that he wasn't in
24   this lane.
25           Q     And you disagree with the drawing
```

1  having him in the left lane?

2          A    If this is his vehicle, he was not in

3  that lane.  He was in this lane.  I was in this lane.

4          Q    And you don't -- at any point you

5  don't recall him being in the left lane?

6          A    Not until he hit me.

7          Q    Okay.  So when you're -- what about

8  the place in the drawing where it says your vehicle

9  came to rest?  I know nothing is exact -- this is not

10  to scale, but do you generally agree that's about

11  where your car ended up?

12          A    Yes.

13          Q    What did you do when your vehicle

14  immediately came to a rest?  What was the first thing

15  you did?

16          A    I called 911.

17          Q    And what did you tell the person that

18  you spoke with?

19          A    I told them that I had been hit by

20  a -- I called it something different.  I called it a

21  tanker truck because I didn't know what it was.

22          Q    Yeah.

23          A    And they asked me if I was hurt.  I

24  told them yes.  They asked me if I needed an

25  ambulance.  I said yes.  And --

```
 1         Q    Were you inside your vehicle for that
 2  call?
 3         A    Yes.
 4         Q    Where did you tell them you were hurt?
 5         A    I don't recall telling them where I
 6  was hurt.
 7         Q    I'm sorry.  Did you lose consciousness
 8  at any time --
 9         A    No.
10         Q    -- to your understanding?  You did
11  not.  Did you exit your vehicle at any point on the
12  scene?
13         A    No.
14         Q    How did you get out of your vehicle?
15         A    I was removed by the ambulance and the
16  first responders.
17         Q    Okay.  Did you attempt to open your
18  door or anything?
19         A    I did not open the door, no.
20         Q    So you remained in your vehicle until
21  the first responders came to your door essentially,
22  right?
23         A    No.
24         Q    Okay.
25         A    Johnny Lipps came, saw that it was my
```

1    truck, come around on my side, opened the truck door,

2    and he was -- he stayed there with me until Caleb

3    Martin came and then the other fire people -- the

4    fire truck people and the ambulance people came.

5         Q    Okay.  Who is Johnny Lipps?

6         A    He is a friend of mine.  He is a

7    former first responder, but he is a friend of mine

8    that used to come in the pawn shop on a regular

9    basis.

10        Q    Do you know is his last name Lipps?

11        A    Yes, it is.

12        Q    L-I-P-S?

13        A    P-P.  L-I-P-P-S.

14        Q    And who is Caleb Martin?

15        A    Caleb Martin is also a first

16   responder.  And he worked for Waupaca, just a friend

17   of ours.  And when the call came out, he came to the

18   scene.  He left Waupaca and came to the scene.

19        Q    Did Johnny Lipps express to you at any

20   point that he observed the collision?

21        A    He did not.

22        Q    Are you aware if anyone other than you

23   and the military driver observed the collision?

24        A    No.

25        Q    You're not aware.  Did you have any

1    discussion with Mr. Lipps or Mr. Martin while they

2    were waiting with you?

3          A    Yes.

4          Q    Do you remember what you talked to

5    them about?

6          A    Yes.

7          Q    What did you talk to them about?

8          A    Staying calm, trying to find where my

9    other shoe was, just being still, because we didn't

10   know how bad I was hurt.

11         Q    Okay.  Did you ever speak with the

12   driver of the military vehicle on the scene?

13         A    Yes.

14         Q    Did he come up to your door?  Is that

15   how that happened?

16         A    Yes, he did.

17         Q    Okay.  Tell me what you recall about

18   that conversation.

19         A    He was on the telephone.  He told

20   someone that he had just hit somebody.  And he told

21   me that the vehicle that he was driving, he was

22   working on it.  It was in disrepair.  And I'm

23   paraphrasing because I don't know exactly what all he

24   did tell me.  But he was test driving it to find out

25   what all was wrong with it and that he was headed

(423) 876-4435         "Preserving The Record"        (800) 298-3376
Whitney Vaughn      Angel & Associates Court Reporting
Case 1:22-cv-00162-DCLC-SKL   Document 31-2   Filed 03/01/24   Page 98 of 151   PageID #:
408

—

1    back to the armory.

2         Q    **Was there any discussion with him**

3    **about the cause of the accident?**

4         A    He said he didn't see me.

5         Q    **Okay.  Do you recall where on your**

6    **body you were experiencing pain after the collision?**

7         A    My shoulder was hurting and my foot

8    was hurting.  My head was hurting because I had glass

9    all in my hair.

10        Q    **Where did the glass come from within**

11   **the vehicle?**

12        A    Every window in the truck got blew

13   out.

14        Q    **I think you've already answered this,**

15   **but you did not speak with the state trooper on the**

16   **scene?**

17        A    No.

18        Q    **Did you see the state trooper on the**

19   **scene --**

20        A    No.

21        Q    **-- before you were taken away?**

22        A    No.

23        Q    **Did you see any law enforcement before**

24   **being taken away?**

25        A    Yes.

1          Q     Who -- which law enforcement do you
2    recall seeing?
3          A     A county officer.
4          Q     Okay.  Did you know that officer's
5    name?
6          A     No.  It's somebody that I've seen
7    before, but no.
8          Q     Did you speak with that person?
9          A     Yes.
10         Q     Is it a male?
11         A     It was.
12         Q     Do you remember what you spoke with
13   him about?
14         A     I do.
15         Q     What was that?
16         A     The gun that was in the door.
17         Q     Okay.
18         A     He asked me what did I want him to do
19   with it.  He unloaded it and gave it to Caleb Martin.
20         Q     Was there anybody else other than this
21   Officer Johnny Lipps, Caleb Martin, and the driver of
22   the military vehicle that you spoke with on the scene
23   of the collision?
24         A     Yes.
25         Q     Who?

```
 1            A      Jessica, one of the ambulance people.
 2    There was a couple of other people there, but I don't
 3    know their names.  There are people that I'm familiar
 4    with, but I don't remember their names.
 5            Q      Okay.
 6            A      Derrick Ingram is one, and he is from
 7    the Etowah Fire Department.
 8            Q      Okay.
 9            A      He showed up on the scene, too.
10            Q      What was his last name again?
11            A      Ingram.
12            Q      And my understanding, you were taken
13    to UT Medical Center in Knoxville?
14            A      Yes.
15            Q      How were you taken?  By ambulance?
16            A      By ambulance.
17            Q      Why were you taken there, do you know?
18            A      I do know.  They called Danny, asked
19    him which one to take me to, and they said that they
20    were not taking me to Athens and they were not going
21    to take me to Cleveland and they didn't really want
22    to take me to Chattanooga.  They said that it would
23    be better to take me to that unit, that trauma unit.
24            Q      Okay.  Was the reason, to your
25    understanding, the availability of the trauma service
```

1  or was there something about the other hospitals
2  that --
3         A     I think it was the service.
4         Q     The trauma service?  The availability
5  of the trauma service at UT Medical Center?
6         A     Yes.
7         Q     Tell me what you remember about your
8  hospitalization at UT Medical Center.
9         A     I remember that they did a CT scan on
10  me.  My blood pressure was extremely high, and they
11  were trying to get my blood pressure under control.
12  They gave me -- they gave me some medicine for the
13  pain.  I don't remember what it was.  And they said I
14  need to follow up with my primary care the next day.
15         Q     Okay.  You said there were some CT
16  scans done.  Do you know of what parts of your body?
17         A     I think it was the entire -- an entire
18  body scan.
19         Q     Did anyone else join you at UT Medical
20  Center?  Your husband?
21         A     My husband.
22         Q     He ended up coming as well?
23         A     Yes.
24         Q     Do you know if he was present for any
25  of the conversations with the medical providers?

1          A     I do not know.

2          Q     **About how long were you at UT Medical**

3     **Center that day?**

4          A     Until that night.  It was about 11 or

5     12:00 before we got home that night.

6          Q     **And did your husband drive you home**

7     **from there?**

8          A     Yes.

9          Q     **Do you remember what you were told**

10    **about the medical findings at UT Medical Center about**

11    **your injuries?**

12         A     No.

13              MR. FAIR:  I want to show you a

14    document from UT Medical Center.  Let's go ahead and

15    mark it 10 before we talk about it.

16              (Whereupon, the document, as referred

17    to above, was marked and subsequently attached hereto

18    as Exhibit No. 10.)

19    BY MR. FAIR:

20         Q     **This is the history and physical from**

21    **the trauma service at UT Medical Center on**

22    **December 15, 2020.  Does that appear to be correct to**

23    **you?**

24              MR. FAIR:  Shoot.  Here.  You take

25    this one.  Let's mark that one the exhibit.  I had a

1   page missing on the one I handed her.

2                   (Whereupon, Exhibit Number 10 was

3   remarked.)

4                   MR. KUHLMAN:  You want to use mine?

5                   MR. FAIR:  Sure.  I don't think I'm

6   talking about the first page anyways.

7   BY MR. FAIR:

8           Q     All right.  So the fourth page of this

9   at the -- probably the third page, at the bottom it

10  says page 13 of 32.  Do you see where it says page 13

11  of 32?  Is that the right page?

12          A     Yes.

13          Q     Towards the bottom of this it says

14  diagnostic results.

15          A     Uh-huh.

16          Q     Do you see that?

17          A     Yes.

18          Q     And this one says tibia and fibula,

19  right, AP and lat.  Do you see that?

20          A     Yes.

21          Q     And it goes on to the next page.  And

22  at the top of that page for that study, what does it

23  say for the impression?

24          A     12/15/20, 14:43:40.

25          Q     What does it say below impression?

1          A    No acute findings.

2          Q    Okay.  And then the next study on this

3    same page says a CT scan of the C-spine without

4    contrast.  What does it say for the impression on

5    that one?

6          A    No acute findings.

7          Q    And then below that, the CT -- the

8    trauma CT of the thorax, abdomen, and pelvis.  What

9    does it say for the impression there?

10         A    No acute traumatic findings.

11         Q    Okay.  Do you remember having any

12   discussion with the medical providers about the CT

13   scans showing no acute findings?

14         A    No.

15         Q    Okay.  The next page, which says page

16   15 of 32 at the bottom, there is a Resident

17   Assessment and Plan section towards the middle of

18   that.  Do you see that?

19         A    Yes.

20         Q    The first sentence of that, could you

21   read that for the record?

22         A    53-year-old female s/p MVC as

23   restrained driver resulting in no acute traumatic

24   injuries.  C-collar was cleared without issue.

25         Q    Yeah.  Just the first sentence.  You

1    don't have to keep --

2            A       Sorry.

3            Q       And then towards the bottom of that

4    page, the attending physician's assessment and plan,

5    towards the middle of that paragraph, it starts with

6    53-year-old female.  Do you see where it says that?

7            A       Yes.

8            Q       Could you read that sentence just

9    through the end of the paragraph?

10           A       Status post MVC.  Restrained driver

11   complaining of back pain, right lower extremity pain,

12   and hip pain.

13           Q       Just read through the end of that

14   paragraph.

15           A       No injuries noted on imaging.  I did

16   a -- I don't know what that word is.

17           Q       Tertiary.

18           A       -- tertiary exam of her and looked

19   back on her images and could not find anything of

20   note.  Cervical collar was cleared.  Patient is

21   medically stable to be discharged.  Trauma office

22   phone number given to call with any questions or

23   concerns.  Trauma office followup as needed.

24           Q       Okay.  And do you recall any

25   discussion with the medical providers of no injuries

1    found on your imaging studies?

2            A    No.

3            Q    Would that surprise you that there

4    were no injuries found on your imaging studies?

5                    MR. KUHLMAN:  Calls for speculation.

6    BY MR. FAIR:

7            Q    Yeah.  Would it surprise you?

8            A    It does surprise me.

9            Q    After the -- after the collision at

10   any point did you visit the field maintenance shop?

11           A    Are you talking about at the military?

12           Q    Yeah.

13           A    Yes.

14           Q    Tell me what you remember about that

15   visit, about when that was and the --

16           A    The very --

17           Q    -- purpose.

18           A    -- next day.

19           Q    What was the purpose of that visit?

20           A    We went there to look at the vehicle.

21   Danny and I went there to look at the vehicle and to

22   talk with the fellow that had hit me.

23           Q    What -- did you get to speak with him?

24           A    Yes, we did.

25           Q    What do you remember about that

1    discussion?

2              A    He told me he didn't see me.

3              Q    Okay.  Did you speak with anyone else

4    while you were there?

5              A    Yes.

6              Q    Who did you speak with?

7              A    Trevor Jones.

8              Q    And did you know Trevor Jones

9    previously?

10             A    No.

11             Q    What did you speak with Trevor Jones

12   about?

13             A    About the accident.

14             Q    And what do you remember discussing

15   with him?

16             A    He told us that that vehicle was at

17   the maintenance shop there to be worked on and that

18   was their normal travel, to take it up there and test

19   drive it to -- and bring it back down to the armory.

20   And it had to be towed back to the armory.  He did

21   tell us that.

22             Q    Did you see any other military

23   personnel on the scene of the accident?

24             A    Yes.

25             Q    Was Trevor Jones one of them, do you

1  know?

2          A      I don't know.

3          Q      Did you speak with any of them?

4          A      No.

5                 MR. FAIR:  I want to show you a

6  medical record from your PCP.  This is dated

7  December 18th, 2020.  Let's go ahead and mark it 11.

8                 (Whereupon, the document, as referred

9  to above, was marked and subsequently attached hereto

10 as Exhibit No. 11.)

11 BY MR. FAIR:

12         Q      And according to this record, you were

13 complaining of mid to low back pain, correct?

14         A      Yes.

15         Q      I don't see any complaints on here

16 about any other pain in any other parts of your body.

17 Do you remember experiencing pain at that time

18 anywhere else on your body?

19         A      Yes.

20         Q      Okay.  Where would you have been

21 experiencing pain?

22         A      My foot.  I couldn't walk.  My knee

23 was hurting.

24         Q      Okay.

25         A      And I don't know if my shoulder was

1  hurting that day or not.

2      Q    Okay.  Do you believe you did discuss

3  that pain with your medical provider that day?

4      A    Yes.

5      Q    Just -- you don't know why it was not

6  documented on this record?

7      A    I have no idea.

8      Q    And you also said in the paragraph

9  under the back pain section -- do you see that?  It

10 starts with mid to low back pain.

11     A    Yes.

12     Q    The third sentence says, Had CT of

13 back and was told my back is fine on CT, but they

14 found some other things.  Do you remember saying that

15 to your medical provider?

16     A    No.

17     Q    Do you remember being told by the

18 providers at UT that your back was fine?

19     A    No.

20     Q    Okay.  They found some other things.

21 Do you know what you were referring to there?

22     A    Yes.

23     Q    What were you referring to?

24     A    They gave me a copy of the CT scan and

25 I was talking about the cyst in my liver.

1          Q     The incidental finding?

2          A     Yes.

3                MR. FAIR:  And I want to show you --

4     we'll mark that 12 and talk about it.

5                (Whereupon, the document, as referred

6     to above, was marked and subsequently attached hereto

7     as Exhibit No. 12.)

8     BY MR. FAIR:

9          Q     This is a record from Cleveland

10    Imaging, an MRI of the lumbar spine performed on

11    December 23rd, 2020.  Does that look correct to you,

12    what I just said?

13         A     Yes.

14         Q     If you'll go to the second page of

15    this, it has impression.  Could you read what's after

16    number 1 under impression?

17         A     You mean number 2?

18         Q     Number -- number 1 here.

19         A     Multilevel degenerative changes

20    resulting in variable central canal, lateral recess

21    and foraminal narrowing, as detailed above in the

22    individual level.  Next line.

23         Q     And do you have any understanding what

24    the word degenerative means in that sentence?

25         A     Well, again, I will say that it's

1    probably something that's ongoing.  I don't know.

2          Q    And then number 5 under impression,

3    what does that say?

4          A    No acute finding.

5          Q    And did you have any discussion with

6    your medical provider about the results of this MRI

7    and no acute findings?

8          A    I don't recall.  I don't know.

9          Q    Okay.  Do you know -- was there a time

10   when an imaging study did make certain findings

11   related to your injuries that you recall?

12         A    Yes.

13         Q    Do you know about when that would have

14   been?

15         A    I don't know the date, no.

16         Q    Okay.  Do you think it would have been

17   after this December 23rd date?

18         A    Yes.

19         Q    Okay.  Do you remember where you were

20   for that?

21         A    They were also done at Cleveland

22   Imaging.

23         Q    And what do you remember being found

24   on those studies after the 23rd?

25         A    That I have bulging disks in my lower

1  back, in my neck.  This doctor referred me to the

2  orthopaedic group.

3         Q     Okay.

4         A     This Dr. Kate Walter.

5         Q     Yeah.  At any time between the motor

6  vehicle collision on December 15th and whatever date

7  that was that those findings on the imaging studies

8  were told to you, did you suffer any other traumatic

9  event?  Did you have any falls or any other motor

10 vehicle collisions?

11        A     No.

12        Q     Okay.  Do you -- I'm sorry.  Strike

13 that.

14              I want to talk about a list that we

15 were provided.  This is called the Plaintiff's First

16 Supplement to the Initial Disclosures.  Oh, sorry.

17 Let me have that.  I marked on that one.  Thank you.

18 And let's go ahead and mark it.

19        A     Can I have one minute?

20              MR. FAIR:  Yes.

21              (Whereupon, a short break was had.)

22              (Whereupon, the document, as referred

23 to above, was marked and subsequently attached hereto

24 as Exhibit No. 13.)

25 //

1  BY MR. FAIR:

2          Q     If you'll go to page 5 of what we have

3  marked Exhibit 13, it does have page numbers on the

4  bottom.  I fully have no expectation that you

5  prepared this document, but this is a list of medical

6  expenses that are being claimed in this lawsuit.  And

7  I just want to cover some of them to clarify for

8  myself.  This is arranged by date of service in the

9  left column, medical provider in the middle column,

10  and the total amount of money billed by that medical

11  provider in the right column.  Do you see that?

12          A     Yes.

13          Q     There are certain entries that, from

14  what you have testified already, I would not expect

15  would be related to your claims in this lawsuit about

16  your injuries, but I just want to make sure.  So

17  towards the middle of this page there are three

18  entries from Blue Ridge Pulmonary.  What type of

19  medical service does Blue Ridge Pulmonary provide to

20  you?

21          A     The COPD.

22          Q     And you don't relate COPD to your

23  injuries in this lawsuit?

24          A     No.

25          Q     Then towards the bottom of this there

1  are entries from Chattanooga Heart and Liver.  Do you
2  see that?
3           A    Yes.
4           Q    You don't result -- you don't relate
5  any treatment from Chattanooga Heart and Liver to
6  your injuries in this lawsuit?
7           A    No.
8           Q    Okay.  There is another one towards
9  the top, 1/27/2021 from Blue Ridge Pulmonary;
10 2/15/2021, it says Liver; and 2/19/2021, Blue Ridge
11 Pulmonary; 2/25/2021, Blue Ridge Pulmonary;
12 3/10/2021, Blue Ridge Pulmonary; 3/18/2021,
13 Chattanooga Heart; and 3/31/2021, Blue Ridge
14 Pulmonary.  You would agree none of those are related
15 to your injuries in this lawsuit?
16          A    Correct.
17          Q    The next page, page 7, there are
18 entries on 6/21/2021 from Chattanooga Heart; also
19 7/19/2021, Chattanooga Heart.  You would agree those
20 are not related to this lawsuit, correct?
21          A    Correct.
22          Q    There is an entry on August 18th,
23 2021, Starr Regional Medical Center.  And it's a cost
24 of $15,860.  Do you know what treatment that is
25 referencing?

1         A    That was an MRI that I had on my head.

2    They were trying to figure out if the headache that I

3    was having was related.

4         Q    So that's one that you would probably

5    relate to this lawsuit, correct?

6         A    Yes.

7         Q    On page 8, 11/30/2021, Allied Eye.  Is

8    that optometry care?

9         A    Yes.

10        Q    Are you relating that to your injuries

11   in this lawsuit?

12        A    I would say yes.

13        Q    Why is that?

14        A    I had some double vision, and they

15   don't know if that's caused from the thing in my head

16   or not.

17        Q    3/3/2022, there are two Chattanooga

18   Heart entries, also 3/24/2022.  And then 8/3/2022,

19   Gastrointestinal Associates.  You would not relate

20   any of those to the injuries in this lawsuit,

21   correct?

22        A    No.

23        Q    If you go to the top of page 9,

24   8/9/2022, Gastrointestinal Associates, same date.

25   Novamed Surgery Center.  Do you know what that would

1    be referencing?

2            A    That's the day I had a colonoscopy.

3            Q    You're not relating that to the

4    injuries in the lawsuit?

5            A    No.

6            Q    9/7/2022, Gastrointestinal Associates.

7    9/26/2022, Chattanooga Heart.  There is two entries.

8    10/13/2022, Gastrointestinal Associates.  10/17/2022,

9    Premier Surgical, which is Dr. Dunn's group.

10           A    Yes.

11           Q    11/1/2022, there is a Premier Surgical

12   entry and there is a Tennova Cleveland where Dr. Dunn

13   performed your laparoscopic cholecystectomy.

14           A    Yes.

15           Q    Those are not related to this lawsuit?

16           A    No.

17           Q    11/29/2022, Skin Cancer and Cosmetic.

18   Do you know what that relates to?

19           A    Yes.  I had a -- no.  Whenever I had

20   my colon -- I mean my gallbladder removed, they

21   damaged my arm, and I had to go there to get

22   treatment.  So that is not related.

23           Q    Okay.  12/5/2022, Blue Ridge

24   Pulmonary; 1/16/2023, Gastrointestinal Associates.

25   You wouldn't relate those, correct?

1        A    No.

2        Q    2/13/2023 at the bottom there,

3 Nephrology Associates.  Your nephrology care you're

4 not relating to this accident, correct?

5        A    No.

6        Q    Page 10, 2/24/2023, Gastrointestinal

7 Associates; 3/2/2023, Nephrology Associates;

8 3/17/2023, there are two Nephrology Associates

9 entries; 3/27/2023, there is a Nephrology Associates

10 entry.  You wouldn't relate those to the injuries in

11 this lawsuit, correct?

12        A    No.

13        Q    3/31/2023, there is an $11,265 bill

14 from Tennova Cleveland.  And looking at your records,

15 I attempted to relate that, and it looked like you

16 underwent a CT for liver cysts that day.

17        A    Yes.

18        Q    Do you have any recollection of that?

19        A    Yes.

20        Q    Is that all that would have occurred

21 that day, that you can recall?

22        A    Yes.

23        Q    You're not relating that to your

24 injuries in this lawsuit, correct?

25        A    No.

(423) 876-4435       "Preserving The Record"      (800) 298-3376
Whitney Vaughn      Angel & Associates Court Reporting
Case 1:22-cv-00162-DCLC-SKL   Document 31-2   Filed 03/01/24   Page 118 of 151   PageID #: 428

1          Q     Six -- the next page, 6/26/2023, there
2    is a Gastrointestinal Associates.  Who is Dr. Stephen
3    Dreskin?
4          A     He is pain management --
5          Q     Okay.
6          A     -- that I was referred to.
7          Q     And then page 12, there are two
8    entries, Nephrology Associates, on 9/20/2023; and
9    then on 9/26, Gastrointestinal Associates; and 9/27,
10   Nephrology Associates.
11         A     Correct.
12         Q     You agree those are not related,
13   correct?
14         A     They are not.
15         Q     Okay.  We were also given some photos.
16   Actually, let me do this first.  You filed some
17   expert disclosures in this lawsuit, and there are
18   certain medical providers listed.  And I just want to
19   make sure I understand what each of these persons'
20   relationship is to you on your medical care.
21              MR. KUHLMAN:  You going to call this
22   14?
23              MR. FAIR:  Yeah.  Let's call it 14.
24   Thank you.
25   //

```
 1                    (Whereupon, the document, as referred
 2   to above, was marked and subsequently attached hereto
 3   as Exhibit No. 14.)
 4   BY MR. FAIR:
 5           Q      You listed first Jeremy Bruce, M.D.
 6   And I think you told me earlier he did the right knee
 7   surgery, correct?
 8           A      Yes.
 9           Q      Has he treated other parts of your
10   body other than your right knee?
11           A      My shoulder.
12           Q      He has treated your shoulder as well.
13   Okay.  Are you still seeing him right now?
14           A      No.
15           Q      You've moved to Dr. Freeman on both
16   your shoulder and your right knee?
17           A      Correct.
18           Q      Jessica Walker, physical therapist.
19   Are you still seeing Ms. Walker?
20           A      No.
21           Q      What is her practice?  What's the
22   name?
23           A      Benchmark.
24           Q      When did you see her in general terms?
25           A      From March the 9th until June 5th.
```

1          Q     Of what year?

2          A     Of this year of 2023.  She was the

3 physical therapies for my knee --

4          Q     Knee surgery?

5          A     -- replacement, yes

6          Q     Sorry.  I talked over you there.  The

7 next page, Joyce Mills, M.D.  And you have got listed

8 there that she is a pathologist who interpreted a

9 study in February 2023.  Do you know what that is

10 referring to?

11          A     No, sir.

12          Q     That's okay.  Stephen Dreskin you

13 already told me about.  He is a pain doctor, right?

14          A     Correct.

15          Q     And how -- are you still seeing

16 Dr. Dreskin?

17          A     Yes.

18          Q     When did you start seeing Dr. Dreskin?

19          A     I think maybe around February of 2023.

20          Q     Okay.  Luke Ebersole, also a physical

21 therapist at Erlanger, correct?

22          A     Yes.

23          Q     Are you seeing him currently?

24          A     No.

25          Q     When did you see Mr. Ebersole?

(423) 876-4435        "Preserving The Record"        (800) 298-3376
Whitney Vaughn        Angel & Associates Court Reporting
Case 1:22-cv-00162-DCLC-SKL   Document 31-2   Filed 03/01/24   Page 121 of 151   PageID #: 431

```
 1          A     I started seeing him after we had the
 2    knee manipulation on my knee, and then I saw him up
 3    until September or October.
 4          Q     Okay.  What do you mean by the knee
 5    manipulation?
 6          A     I had a knee manipulation June the
 7    6th.
 8          Q     Of this year?
 9          A     Yes.
10          Q     What is a knee manipulation?
11          A     It's to try to get my leg to go
12    straight.
13          Q     I see.  And this would have been after
14    your surgery?
15          A     Yes.
16          Q     Was it successful in getting your leg
17    to go straight?
18          A     No.
19          Q     The next person listed, Bryce Martin,
20    also a physical therapist with Erlanger.  Are you
21    still seeing Mr. Martin?
22          A     No.
23          Q     Were you seeing him around the same
24    time as Mr. Ebersole?
25          A     Yeah.  He is in with that group.
```

1          Q     Okay.  Dr. David Lowry at Erlanger
2   Orthopaedics.  I think you told me about him before.
3   Just remind me.
4          A     He is my back doctor.
5          Q     Your back orthopaedic doctor?
6          A     Yes.
7          Q     Dr. William Garrett, what's his role?
8          A     He also works for Erlanger.  He is
9   the -- he is the first person that I saw whenever I
10  started going to that group.  And then he evaluated
11  me and gave me to other doctors.
12         Q     Okay.
13         A     He gave me away.
14         Q     And then Dr. Lindsay McKnight, the
15  trauma attending at UT Medical Center, right?
16         A     Yeah, I'm assuming.  I don't know her.
17         Q     All right.  Dr. Tareck Kadrie,
18  "Kadrie"?
19         A     Kadrie.
20         Q     Kadrie.  Neurologist?
21         A     Yes.
22         Q     You still seeing Dr. Kadrie?
23         A     No.  He is the person that told me I
24  have a pinched nerve in my arm.  And they -- he gave
25  me back to my regular doctor.

1    **Q      Okay.  Eric --**

2    A      He is like a specialist.

3    **Q      I see.  Dr. Eric Emanski?**

4    A      Yes.

5    **Q      What's his role?**

6    A      He -- he is over there near Erlanger.

7    He is the one that told Dr. Lowry about what was

8    wrong with my back.  And he told them that I needed

9    to have some facet injections, so Dr. Lowry did that.

10   **Q      Okay.  And you're not seeing**

11   **Dr. Emanski currently?**

12   A      No.

13   **Q      Dr. Kimberly Smith, I think you told**

14   **me about her earlier, a neurologist, right?**

15   A      She is a neurologist.

16   **Q      Are you still seeing her?**

17   A      Yes.

18   **Q      What is she providing you again?**

19   A      She treats me for my migraines.

20   **Q      And then Dr. Mark Freeman is the**

21   **orthopaedic surgeon who is going to perform your**

22   **right -- your second right knee surgery on**

23   **December 15?**

24   A      Correct.

25   **Q      And he is also helping with your**

1    **shoulder now, right?**

2              A    Yes.

3              MR. FAIR:  Now let's look at these

4    pictures.  And if you'll bear with me one second, I

5    think the easiest way to do this -- they are stapled

6    together.  These are the pictures you provided me.

7    I'm going to give each one a letter so we can just

8    reference what each one is.  Okay.  Let's mark this

9    Collective 15.  Each one has its own letter.

10              (Whereupon, the photographs, as

11    referred to above, were marked and subsequently

12    attached hereto as Collective Exhibit No. 15.)

13              MR. KUHLMAN:  How far did you get in

14    the alphabet?

15              MR. FAIR:  I got to V.

16              THE WITNESS:  I thought I saw W.

17              THE COURT REPORTER:  I thought I saw

18    W, too.

19              MR. FAIR:  Oh, maybe I got to W.

20    Sorry.  I am going quickly.  I'll mark for my own

21    reference.

22    BY MR. FAIR:

23         **Q    All right.  So let's look at 15-A.  Is**

24    **this a photo you took?**

25              A    Yes.

1          Q      Okay.  What am I seeing here?

2          A      You're seeing a bruise, and I believe

3     it's going to be on this part of my arm.

4          Q      You're pointing to your right arm on

5     the forearm?

6          A      Yes.

7          Q      Okay.  And when would you have taken

8     this photograph?

9          A      This was a couple of days after the

10    wreck.

11         Q      Not sure exactly when, but two or

12    three days?

13         A      Yeah.

14         Q      Does that sound about right?

15         A      Yeah.

16         Q      15-B, tell me what I'm seeing here.

17         A      The top part of my chest bruising.

18         Q      And are there bruises on both sides

19    there?

20         A      Yes.

21         Q      And you have taken this photo around

22    the same time?

23         A      Yes.

24         Q      Do you know how you received these

25    bruises?  And by that I mean, when you had the

1  collision, do you remember what parts of your car

2  your body hit?

3          A    I think my hands hit myself, and

4  I went down -- I think, because my hands are all

5  bruised also.

6          Q    I see.  15-C, this appears to be your

7  left hand assuming there is no mirroring going on.

8          A    Yes.

9          Q    You have got some bruise on your --

10 some bruises really on the entire top part of your

11 hand.  I don't know what we call that part of your

12 hand, the opposite of your palm.  But it looks like

13 the most prominent bruising are on your index and

14 middle knuckle.  Does that sound correct to you?

15         A    Yes.

16         Q    And you took this about the same time?

17         A    Yes.

18         Q    15-D, I believe we're looking at your

19 right arm.

20         A    No.  It's this arm.

21         Q    Your left arm.  The inner part of your

22 forearm, correct?

23         A    Yes.

24         Q    And there is a bruise right there in

25 the middle, right?

```
 1              A      Yes.
 2              Q      And you took this about the same time?
 3              A      Yes.
 4              Q      15-E, this appears to be your right
 5     hand and the primary bruising on your middle and ring
 6     knuckle.
 7              A      Yes.
 8              Q      Taken around the same time?
 9              A      Yes.
10              Q      It's easier to have time stamps.  They
11     are all 9/13.  First one was 9/12.  Second one
12     doesn't have one.  15-F has a 9/15 time stamp.  Where
13     are we looking on your body here?
14              A      That's the back part of my left hip.
15              Q      Okay.  Back part of your left hip
16     there is a bruise, right?
17              A      Yes.
18              Q      15-G has a time stamp of 9/15.  And I
19     guess I should clarify.  This time stamp -- it looks
20     like these are screenshots, right?
21              A      They are.
22              Q      So this is probably just when you took
23     a screenshot of your phone, not necessarily when you
24     took the photograph, right?
25              A      Exactly.
```

1      Q     But you took this photograph around

2   the same time as the other ones we have looked prior

3   to this, right?

4      A     Yes.

5      Q     Okay.  What part of your body are we

6   looking at here?

7      A     That's the inside of my right leg from

8   my knee down toward my ankle.

9      Q     Calf area on the inside, there is a

10  bruise?

11     A     Yes.

12     Q     15-H, what are we seeing here?

13     A     That's the outside of my leg looking

14  down from my knee down to my ankle.

15     Q     Is this in the calf area?  I don't

16  have my bearings on this one.

17     A     I believe it's just going to be right

18  past my ankle -- I mean right past my knee going down

19  towards my ankle.

20     Q     Okay.  Taken around the same time as

21  the ones before it?

22     A     Yes.

23     Q     All right.  15-I, what am I seeing

24  here?

25     A     That's the scene of the accident.

1        **Q**     **Okay.  And when was this taken?**

2        A     I would say just a few days after the

3 wreck.

4        **Q**     **Taken by you?**

5        A     Yes.

6        **Q**     **And who was with you?**

7        A     I don't -- I don't know if Danny was

8 with me that day or not.

9        **Q**     **Did you walk down from your house?**

10       A     Oh, no.  No.

11       **Q**     **You said 1.8 miles, right?**

12       A     Yeah.  It's 1.8 miles --

13       **Q**     **So --**

14       A     -- thereabout.

15       **Q**     **So where did -- did you just park your**

16 **vehicle?**

17       A     There is a house.  There is a house

18 right here, and I parked in the drive -- they have a

19 driveway.

20       **Q**     **Okay.**

21           MR. KUHLMAN:  Y'all are having a nice

22 conversation.  This transcript is going to be -- just

23 let him ask you a question and then answer it so that

24 we can get this taken down in a way that makes sense

25 and we can read it later.  Okay?  She is having a

(423) 876-4435        "Preserving The Record"        (800) 298-3376
Whitney Vaughn        Angel & Associates Court Reporting
Case 1:22-cv-00162-DCLC-SKL   Document 31-2   Filed 03/01/24   Page 130 of 151   PageID #: 440

1    hard time with y'all just chatting.

2    BY MR. FAIR:

3        **Q      Okay.  15-J, tell me what I'm seeing**

4    **here.**

5        A      That is also the scene of the

6    accident.

7        **Q      It looks like you have just turned**

8    **slightly to the left from 15-I.  Does that sound**

9    **about right?**

10       A      Yes.

11       **Q      Taken the same day?**

12       A      Yes.

13       **Q      15-K, what am I seeing?**

14       A      That is where my truck -- my truck was

15   over there by that yield sign just on this side of

16   it.

17       **Q      So your truck -- where your truck**

18   **ended up after the collision --**

19       A      Yes.

20       **Q      -- on the side of the yield sign where**

21   **you're standing?**

22       A      Yes.

23       **Q      Okay.**

24       A      Not on the side where -- in this area.

25   I was standing over here.

1      Q    Right.  I meant on that side of the
2 yield sign as opposed to behind the yield sign.
3      A    Yes.
4      Q    15-L, what am I seeing?
5      A    This is just a picture pointed in the
6 direction that I was headed.
7      Q    So this is behind where the collision
8 occurred or is this beyond where the collision
9 occurred?
10      A    This is prior to.  This is headed in
11 the direction where we had the wreck.
12      Q    Okay.  15-M?
13      A    Just a different view of that.
14      Q    Of --
15      A    Same direction.
16      Q    Different view of 15-L?
17      A    Yes.
18      Q    15-N, what am I seeing?
19      A    This is a -- this is about where the
20 wreck happened.  This is looking toward where the
21 wreck actually happened right in that area.
22      Q    I see two vehicles in the distance on
23 15-N.  One is a little further away.  Is that around
24 where the accident occurred, do you think, where
25 that --

1         A      I believe so.

2         Q      -- vehicle is?

3         A      I believe it's right about where that

4    vehicle is.

5         Q      Okay.  15-O?

6         A      That's the intersection where the

7    accident happened.

8         Q      Okay.  And I think -- they just

9    repeated themselves.  Yeah.  So I don't think there

10   are any new pictures after that.

11             Okay.  I want to go back to Exhibit 1

12   and cover just a few things, and then we're close to

13   being finished.  If you'll go to page 4 on Exhibit 1.

14   Interrogatory number 3, we asked you to identify any

15   and all writings, documents, affidavits, photographs,

16   recordings, lots of things that relate to the motor

17   vehicle accident.  And I just want to clarify.  Have

18   you kept any notes about the accident or your

19   treatment over time, anything like that?

20        A      The only thing that I have are the

21   pictures and I have my doctor bills.

22        Q      Okay.  You have not kept a diary of

23   your treatment or anything like that?

24        A      No.

25        Q      Okay.  And have you made any

1    recordings at any time related to this lawsuit?

2         A    No.

3         Q    Okay.  Number 4, also on page 4, we

4    asked if you have made any claim for bodily injury or

5    filed for disability at any time, and there was an

6    objection, and then the answer was no.  But you did

7    file for disability.  When did you originally file

8    for disability?

9         A    I think in May of 2021.

10        Q    Okay.  So at that -- when you said no

11   to this, that wasn't accurate, right?  You had filed

12   for disability at that point?

13        A    I have filed for disability.

14        Q    Yeah.  Number 6 on page 5, we asked if

15   you had been involved in any other litigation.  You

16   said no.  You did tell me about several cases where

17   you have been the plaintiff against tenants, right?

18        A    Yes.

19        Q    Anything other than that and your

20   disability claim that would meet this criteria of

21   being involved in litigation?  Obviously not

22   including this lawsuit that we're here on today.

23        A    Well, I have been involved in divorce

24   litigation.

25        Q    Okay.

1        A     So yes.

2        **Q     Two prior divorces?**

3        A     Yes.

4        **Q     Anything else?**

5        A     I don't think so.

6        **Q     Okay.**

7        A     I've been named in a bankruptcy with

8   people, you know, that owed me money.

9        **Q     You've been a creditor in a**

10  **bankruptcy?**

11       A     Yes.

12       **Q     Someone that was trying to collect**

13  **money from the debtor that filed it?**

14       A     Yes.

15       **Q     You have never filed for bankruptcy**

16  **yourself?**

17       A     Oh, no.

18       **Q     And then if you'll go to page 10,**

19  **number 17, we asked you to identify all of your**

20  **social media accounts.  And there was just an**

21  **objection and no answer to that.  Do you use social**

22  **media?**

23              MR. KUHLMAN:  We'll persist in our

24  objection, but you can answer if you can.

25       A     I do have a Facebook account and now I

1    have an Instagram account.

2    BY MR. FAIR:

3          **Q      Okay.**

4          A      I didn't have that whenever this was

5    taken, but that was only to find our dogs.

6          **Q      How long have you had a Facebook**

7    **account?**

8          A      I don't know.  Fifteen years,

9    probably.

10         **Q      Did you ever post anything in the**

11   **Facebook about the collision?**

12         A      No.

13         **Q      Did you ever post anything on Facebook**

14   **about your injuries from the collision?**

15         A      I don't think so.  Never -- no.

16         **Q      All right.  I want to talk to you just**

17   **about your damages and then we'll wrap up.  To be**

18   **sure I am clear, the injuries you have experienced**

19   **from the collision, you have told me about injuries**

20   **to your lower back, correct?**

21         A      Yes.

22         **Q      Injuries to your left shoulder?**

23         A      Yes.

24         **Q      Injuries to your neck?**

25         A      Yes.

1        **Q**     **Injuries to your right knee?**

2        A     Yes.

3        **Q**     **Injuries to your right ankle?**

4        A     Yes.

5        **Q**     **And you have related that you --**

6 **you're relating the cyst in your brain to this**

7 **collision as well you told me, right?**

8        A     Yes.

9        **Q**     **Any other physical injuries that you**

10 **experienced as a result of the collision that I**

11 **didn't just name?**

12       A     No.

13       **Q**     **What medical treatment are you**

14 **currently undergoing that relate to your injuries**

15 **from the collision?**

16       A     My knee, my back, my head, and my

17 shoulder.

18       **Q**     **Okay.  And you're getting treatment on**

19 **all those things.  Your knee is a subsequent surgery?**

20       A     Yes.

21       **Q**     **What treatment on your back?**

22       A     I haven't had any injections for a few

23 months now, but I need to go and have that done.

24       **Q**     **What treatment are you still receiving**

25 **on your shoulder?**

(423) 876-4435       "Preserving The Record"       (800) 298-3376
Whitney Vaughn      Angel & Associates Court Reporting
Case 1:22-cv-00162-DCLC-SKL   Document 31-2   Filed 03/01/24   Page 137 of 151   PageID #: 447

1        A     I had a nerve block put in my shoulder

2   in February.

3        Q     **And you named one more thing.  Did you**

4   **say your ankle?  No.  You said your ankle was okay.**

5   **What was it that you said?**

6        A     My head.

7        Q     **Your head.**

8        A     My back, my head, my knee, and my

9   shoulder.

10       Q     **And what is the treatment you're still**

11  **receiving on your head?**

12       A     I am having -- I take Nurtec.  And I'm

13  scheduled to have an MRI I believe Thursday to see if

14  it has gotten any bigger or any worse.  Then I have

15  to go see the neurosurgeon in a couple of weeks.

16  It's before I have my knee surgery.  I don't know

17  what the date is.

18       Q     **Okay.  Currently scheduled for an MRI**

19  **related to your head.  Currently scheduled for**

20  **another right knee surgery.  Are you aware of any**

21  **other future medical treatment planned by a medical**

22  **provider for you related to your motor vehicle**

23  **collision injuries?**

24       A     No.

25       Q     **Have you experienced any falls or**

```
 1   other traumatic events since the December 15th, 2020,
 2   collision?
 3          A    I did fall I would say about a year
 4   ago.  It's been about one year, maybe a year and a
 5   month.
 6          Q    Tell me what happened.
 7          A    I fell.  I lost my balance and I fell.
 8          Q    Where were you?
 9          A    In the front yard.
10          Q    And did you injure yourself?
11          A    No.  My pride.
12          Q    Okay.  No other falls with injuries
13   since the collision?
14          A    No.
15          Q    No other traumatic events that caused
16   injuries since the collision?
17          A    No.
18          Q    Are you claiming property damage in
19   this case, to your knowledge?
20          A    Yes.
21          Q    And is that related to your truck?
22          A    Yes.
23          Q    Were you -- did you receive any money
24   from insurance for your truck?
25          A    Yes.
```

1    Q    How much did you receive?

2    A    A little over $42,000.

3    Q    Okay.  Did that cover what you owed on

4    the truck?

5    A    Oh, yes.

6    Q    So earlier you walked me through what

7    a normal day in your life was before the accident.

8    Can you walk me through what a normal day in your

9    life is now?

10    A    It's a disaster.  I can't do anything

11    on my own.  My husband does the laundry.  He does the

12    dishes.  I have a young lady that comes in and does

13    the sweeping and the mopping and the dusting.  We

14    can't go anywhere and be comfortable.  We used to go

15    to Gatlinburg several times a year.  We haven't been

16    one time since this wreck.  We cannot do anything

17    that we used to do.  I can't even walk around in my

18    front yard because I'm on a walker.  I've been on a

19    walker since March.  I can't walk by myself.  I'm

20    a -- I'm a burden.

21    Q    So how do you spend a normal day?

22    A    I usually -- I have a lot of doctors'

23    appointments.  I usually get up and go and do my

24    doctors' appointments.  And I come home and I sit on

25    the sofa until Danny gets there.  I don't -- I don't

1  cook.  I used to cook all the time.  I don't cook
2  anything like I used to.  I just warm something up or
3  eat a sandwich, that kind of stuff.  My whole life
4  has changed since this wreck.

5      Q    Do you have any hobbies now?
6      A    No.
7      Q    Do you still drive a vehicle?
8      A    Yes.
9      Q    How often?
10     A    When I have to go to the doctors.  I
11  don't go anywhere extra, nowhere extra.
12     Q    What vehicle do you drive when you do?
13     A    I either drive the Honda Ridgeline or
14  I drive a Chevrolet Tahoe.
15     Q    And you agree that November 2020
16  before the accident you weren't working, correct?
17     A    No.
18     Q    And your complaint requests $792,000
19  in damages.  Do you have any source for that specific
20  amount?
21     A    Pain and suffering.
22     Q    Okay.  Did you come up with that
23  amount?
24     A    No.
25     Q    Okay.  Are you claiming any

1    **out-of-pocket money expenses that you've had to pay**

2    **as a result of your injuries?**

3           A     I believe that my medical bills will

4    be part of that.  And we have had -- we have to pay

5    our deductible and the 20 percent.

6           **Q     Do you know how much the annual**

7    **deductible is for insurance?**

8           A     It's 4,500.

9           **Q     And you have hit that every year since**

10   **2020?**

11          A     Yes.

12          **Q     Including 2020?**

13          A     Yes.

14                MR. FAIR:  Those are all my questions

15   for you.  Thank you.

16                THE WITNESS:  Thank you.

17                MR. KUHLMAN:  I'm going to ask you

18   just a few questions, Sharon.

19                          EXAMINATION

20   BY MR. KUHLMAN:

21          **Q     Mr. Fair asked you at the beginning of**

22   **this deposition a line of questions about your**

23   **businesses that you owned.  Do you remember those**

24   **questions?**

25          A     Yes.

1       Q       He asked you if you had an accountant

2  who prepared your tax returns.  Do you remember that?

3       A       Yes.

4       Q       Who is your accountant?

5       A       At that time, it was Kevin Wilson.

6       Q       Okay.  And so who would have prepared

7  your tax return for tax year -- for tax year 2018?

8       A       That would have been Affordable Tax,

9  Marilyn Cooley, I believe is her name.

10       Q       And the same question as to 2019?

11       A       That would have been that company in

12  Florida, Optima Tax.

13       Q       In 2020?

14       A       Optima Tax.

15       Q       In 2021?

16       A       Optima Tax.

17       Q       And to the extent that you have --

18  well, I guess we're past the extension deadline now.

19  So if you filed a 2022 return, who filed that return?

20       A       Optima Tax.

21       Q       Mr. Fair asked you some questions

22  about -- you referred to your primary care provider.

23  He was asking you -- he said at one point is that a

24  mid-level provider.  Do you understand the difference

25  between a nurse practitioner or a physician's

1    assistant and a medical doctor?

2            A    I do understand.

3            Q    And to the extent that an expert would

4    tell you this, would you agree that it is the sole

5    providence of a medical doctor to reach diagnoses and

6    express medical opinions on those issues?

7            A    Absolutely.

8            Q    And to the extent that you're seeing a

9    nurse practitioner, that nurse practitioner is

10   supervised by a licensed medical doctor, correct?

11           A    Yes.

12           Q    And so when you were -- your testimony

13   was that a nurse practitioner diagnosed you with

14   particular things.  Would you agree that that's the

15   diagnosis of the doctor -- the medical doctor who is

16   supervising that nurse practitioner?

17           A    Yes.

18           Q    In general, you don't have any

19   specialized medical training, right?

20           A    No.

21           Q    So you would defer to the opinions of

22   the medical providers as evidenced by the chart?

23           A    Yes.

24           Q    Your medical record.  Okay.  Do you

25   know what the term or the initials PRN mean?

1              A      No.   Something registered nurse, I

2    would say.

3              Q      I want to -- if you'll look back at

4    Exhibit 6 and 7, Mr. Fair asked you some questions

5    about the first page of these two exhibits.  I want

6    to just ask you if you'll look to the second page of

7    both of those exhibits.  These are, again, from

8    encounters on November the 4th, November the 5th of

9    2020 before your accident.

10             A      Uh-huh.

11             Q      Look at the second page.  In the

12   section right after the word musculoskeletal, can you

13   tell me what the -- can you read what it says after

14   the colon there?

15             A      Denies joint stiffness or swelling,

16   weakness of muscles/joint -- I don't know what that

17   word is.

18             Q      Arthralgias/arthritis.

19             A      Yeah.  Upper extremity pain and lower

20   extremity pain.

21             Q      Okay.  And is that the same -- do you

22   see that same statement as to Exhibit 7?

23             A      Yes.

24             Q      Mr. Fair asked you some questions

25   about this map that you printed off of the worldwide

1   interweb, a series of connected tubes.  Do you agree

2   that today that when you were marking on Exhibit 8

3   you were just doing that from your memory and you're

4   assuming that this is, in fact, an accurate

5   reflection of the intersection where the accident

6   happened, correct?

7           A    Yes.

8           Q    Mr. Fair asked you about health

9   insurance benefits that you receive, and you said

10  that you have received some medical bills in this

11  case.  You testified about the Iron Workers health

12  insurance plan, correct?

13          A    Yes.

14          Q    Okay.  Do you agree that the Iron

15  Workers health insurance plan has paid a significant

16  portion of the medical bills associated with this

17  accident?

18          A    Yes.

19          Q    Mr. Fair showed you an exhibit which

20  was our supplemental -- first supplement to

21  plaintiff's initial disclosure.  And he asked you

22  about a lot of related versus unrelated medical bills

23  on that exhibit.  You want to -- do you need to look

24  at it?  It's number 13.

25          A    Yes.

1    Q    Okay.  You said that you didn't

2    prepare this, right?

3    A    No.

4    Q    But you would agree with me that you

5    assisted in the preparation or the collection of the

6    bills and claims, documents, et cetera, necessary to

7    prepare this document?

8    A    Yes.

9    Q    Okay.  And so do you agree -- you

10   would agree with me that this figure, the $383,682.93

11   on that Exhibit 13 --

12   A    Yes.

13   Q    -- that that is the total of the

14   medical bills for which Iron Workers has claimed some

15   reimbursement?

16   A    Yes.

17   Q    These photos that Mr. Fair asked you

18   about, we -- I think we established that those are

19   screenshots, right?

20   A    They are.

21   Q    What -- I think you also testified

22   that you took the original photos yourself?

23   A    Yes.

24   Q    Using a camera phone or an iPhone or

25   some other --

```
 1          A      An iPhone.

 2          Q      What model iPhone was that?

 3          A      It would have been an 11.

 4          Q      Do you still have access to that

 5    phone?

 6          A      No.

 7          Q      Okay.  Do you have any other place

 8    where these photos, other than these screenshots,

 9    would be stored electronically?

10          A      There -- no.

11          Q      Okay.  You testified about the photos

12    that you took of the scene and the roadway

13    surrounding those.  The photos of the injuries to

14    your body, can you recall whether or not there was

15    another individual or there was anybody with you at

16    the time that you took those photos?

17          A      My husband.

18          Q      Okay.  Anybody else in the room?

19          A      No.

20          Q      Last question.  Mr. Fair asked you how

21    your life is different or he asked you to describe a

22    typical day following the accident.  And you

23    testified to the fact that you can't go anywhere and

24    be comfortable.  Do you recall that testimony?

25          A      Yes.
```

1        **Q    You're here today not in your house,**

2  **right?**

3        A    Correct.

4        **Q    You're not -- we're not taking this**

5  **deposition at a hospital bed?**

6        A    No.

7        **Q    Okay.  So you can go places, but the**

8  **important part of that is be comfortable.  Do you**

9  **agree with that?**

10       A    Yes.

11       **Q    You have some ability to get around?**

12       A    Yes.

13       **Q    But it's that you're not -- you're not**

14  **able to do it without pain?**

15       A    Correct.

16           MR. KUHLMAN:  Nothing further.

17           MR. FAIR:  I don't have any further

18  questions.

19           FURTHER THE DEPONENT SAITH NOT.

20             (Signature reserved.)

21

22

23

24

25

(423) 876-4435       "Preserving The Record"      (800) 298-3376
Whitney Vaughn      Angel & Associates Court Reporting
Case 1:22-cv-00162-DCLC-SKL   Document 31-2   Filed 03/01/24   Page 149 of 151   PageID #: 459

```
1              E R R A T A   P A G E
2       I, SHARON GUTHRIE, the witness herein, have read
   the transcript of my testimony and the same is true
3  and correct, to the best of my knowledge, with the
   exception of the following changes noted below, if
4  any:
5  Page/Line/                    Change/Reason
6  ---------------------------------------------------
7  ---------------------------------------------------
8  ---------------------------------------------------
9  ---------------------------------------------------
10 ---------------------------------------------------
11 ---------------------------------------------------
12 ---------------------------------------------------
13 ---------------------------------------------------
14 ---------------------------------------------------
15 ---------------------------------------------------
16 ---------------------------------------------------
17 ---------------------------------------------------
18
19              _____
20                 SHARON GUTHRIE
21       Sworn to and subscribed before me, this
        the _____ day of _____, 2023.
22
23
                 _____
24               Notary Public
                 My Commission Expires:
25
```

REPORTER'S CERTIFICATE

1
2
3  STATE OF TENNESSEE  :
4  COUNTY OF HAMILTON  :
5
6         I, Whitney A. Vaughn, Court Reporter and
7  Notary Public, do hereby certify that the foregoing
8  deposition was stenographically recorded by me as
9  stated in the caption.  SHARON GUTHRIE was duly sworn
10 by me; that pages 1 to 151, inclusive, were reduced to
11 typewriting under my direction and supervision, and
12 the deposition is a true and correct record, to the
13 best of my ability, of the testimony/evidence given by
14 the deponent.
15        I further certify that I am not a relative or
16 employee or attorney or counsel of any of the parties,
17 nor am I a relative or employee of such attorney or
18 counsel, nor am I financially interested in the
19 action.  All rates charged are usual and customary.
20        This is the 6th day of December, 2023.
21
22 _____
23 Whitney Vaughn, TN LCR #418
24 Court Reporter and Notary Public
25 My Commission Expires 07/30/25